UNITED STATES of America

v.

John C. TARANTINO, Appellant.

UNITED STATES of America

v.

Robert H. BURNS, Appellant.

UNITED STATES of America

v.

Fred B. BLACK, Jr., Appellant.

UNITED STATES of America

v.

Wilfred Samuel BELL, a/k/a Sam Bell, Appellant.

Nos. 85–5808 to 85–5810, 85–5846.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1987.

Decided April 12, 1988.

As Amended April 12, 1988.

Howard F. Cerny, New York City, for appellant Tarantino.

Robert H. Burns, pro se.

L. Barrett Boss (appointed by this court), with whom Henry W. Asbill, Washington, D.C., (also appointed by this court) was on brief, for appellant Bell.

Loren Kieve (appointed by this court), with whom Jo Anne Swindler, Washington, D.C., was on brief, for appellant Black. Thomas R. Dyson, Washington, D.C., also entered an appearance for appellant Black.

Charles E. Ambrose, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell, Paul L. Knight and Roger M. Adelman, Asst. U.S. Attys.,

Washington, D.C., were on brief, for appellee.

### TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | VARIANCE: SINGLE VERSUS MULTIPLE CONSPIRACIES | 1391 |
| | A. Permissible Variance | 1391 |
| | B. Establishing a Single Conspiracy | 1392 |
| | C. Sufficiency of the Evidence of a Single Conspiracy | 1393 |
| | 1. Burns | 1394 |
| | 2. Black | 1395 |
| | 3. Tarantino | 1397 |
| | 4. Bell | 1398 |
| II. | SEVERANCE | 1398 |
| | A. Disparity in Evidence | 1398 |
| | B. Conflicting Defense Theories | 1399 |
| III. | JURY INSTRUCTIONS | 1400 |
| | A. Single Versus Multiple Conspiracies | 1400 |
| | B. The Travel Act | 1401 |
| | C. The Cash Transaction Reports Instruction | 1403 |
| | D. The Missing Witness Instruction | 1404 |
| | E. Strickland's Guilty Plea | 1404 |
| IV. | RESTRICTIONS ON CROSS-EXAMINATION | 1405 |
| | A. Strickland's Plan to Murder Kupits | 1405 |
| | B. Strickland's Benefits from the Witness Protection Program | 1407 |
| | C. Strickland's Payment of Attorneys' Fees for Nicholls | 1407 |
| | D. Miscellaneous Restrictions on Cross– Examination | 1408 |
| V. | EVIDENTIARY RULINGS | 1408 |
| | A. Admission of Cocaine | 1408 |
| | B. Limitations on Collateral Impeachment | 1409 |
| | C. Prior Consistent Statements | 1411 |
| | D. Co-conspirators' Statements | 1411 |
| VI. | THE REFERENCE TO BLACK'S BEING NAMED IN ANOTHER INDICTMENT | 1413 |
| VII. | DISCLOSURE OF WITNESS STATEMENTS | 1414 |
| | A. Jencks Act | 1414 |
| | B. Sixth Amendment | 1415 |
| | C. *Brady* | 1416 |
| | D. Statements by Co-conspirators | 1417 |
| VIII. | CONTINGENT PLEA ARRANGEMENTS | 1418 |
| IX. | BURNS' DESIRE TO REPRESENT HIMSELF | 1419 |
| X. | THE ERROR IN SENTENCING BELL | 1422 |
| XI. | CONCLUSION | 1422 |

Before SILBERMAN, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

This is an appeal from criminal convictions following a complex, two-month trial before U.S. District Judge Thomas F. Hogan.

All appellants were convicted on count one of the twenty-five count indictment: conspiracy to distribute and to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1982). In addition, John C. Tarantino was convicted as a principal, 18 U.S.C. § 2 (1982), of four counts of violations of the Travel Act, 18 U.S.C. § 1952 (1982). Fred B. Black, Jr. was also convicted of violating the Travel Act, and Wilfred Samuel Bell of distribution of cocaine.

Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), these appellants and others conspired to import, possess, and distribute large quantities of cocaine in various locales, and to launder the proceeds of this illegal activity. Lawrence ("Lonnie") Strickland, the main player in the conspiracy, testified for the government in exchange for a favorable recommendation to the sentencing judge who would consider Strickland's guilty plea. The government's evidence essentially established that (1) Black assisted Strickland in launching his drug operation and in laundering the resulting profits; (2) Robert H. Burns was instrumental in introducing Strickland to major drug importers (for which Burns received commissions) and laundering his illicit profits; (3) Tarantino participated heavily in distributing Strickland's cocaine and laundering his profits; and (4) Bell was Strickland's main distributor in the Washington, D.C. area.

Following guilty pleas by various defendants not now before us, a trial of the charges against Tarantino, Black, and Burns began on May 14, 1984. Judge Hogan declared a mistrial on June 13, 1984, and a new trial, in which Bell was joined, began on January 11, 1985. The jury returned the convictions on March 8, 1985.

We commend Judge Hogan on his conduct of this long and difficult trial. Apart from a few errors that we conclude did not deprive appellants of their right to a fair trial, Judge Hogan's management of the proceedings was admirable. We affirm in all respects, except that we remand Bell's sentence for compliance with Federal Rule of Criminal Procedure 32(c)(3)(D).

## I. VARIANCE: SINGLE VERSUS MULTIPLE CONSPIRACIES

Each appellant argues that the evidence at trial varied impermissibly from the allegations of the indictment, and that the resultant prejudice deprived him of his right to a fair trial.

### A. *Permissible Variance*

■■■ A variance between the allegations of the indictment and the proof at trial constitutes grounds for reversal only if the appellant proves (1) that the evidence at trial established facts materially variant from those alleged in the indictment, and (2) that the variance caused substantial prejudice. *See, e.g., United States v. Caporale*, 806 F.2d 1487, 1499–1500 (11th Cir. 1986), *cert. denied*, — U.S. ——, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987). In a conspiracy prosecution, for example, the appellant may prove (1) that the evidence established the existence of multiple conspiracies, rather than the one conspiracy alleged in the indictment, and (2) that because of the multiplicity of defendants and conspiracies, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another. *Id.*

■■■ The existence of a single conspiracy or multiple conspiracies is primarily a question of fact for the jury. *E.g., United States v. Erwin*, 793 F.2d 656, 662 (5th Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986); *United States v. Molt*, 772 F.2d 366, 369 (7th Cir.1985), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 715 (1986); *United States v. Potamitis*, 739 F.2d 784, 787 (2d Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984). The verdict must be upheld if the evidence adequately supports a finding that a single conspiracy existed. *Potamitis*, 739 F.2d at 788; *United States v. Arbelaez*, 719 F.2d 1453, 1457–58 (9th Cir.1983), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984); *cf. Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (verdict

upheld if any rational trier of fact could have found elements of offense beyond reasonable doubt).

### B. *Establishing a Single Conspiracy*

Appellants Bell and Burns urge us to follow the analysis of conspiracies used in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *Kotteakos* involved multiple conspiracies to defraud the Federal Housing Administration. The key figure, Brown, arranged with various defendants to submit false loan applications. None of the applicants had any connection with the others, although each had a relationship with Brown. Nevertheless, the government charged all the applicants with participation in a single conspiracy. On appeal, the government acknowledged that the proof established multiple conspiracies. Brown was the hub of a wheel, and the various applicants were the spokes. Without a rim to enclose the spokes, however, the evidence made out multiple conspiracies, not the single one alleged. 328 U.S. at 755, 66 S.Ct. at 1243. The government granted this much, but merely argued that the variance was harmless, a position that the Supreme Court rejected.

The wheel metaphor has not been strictly applied as the method of analysis for all conspiracies, and particularly not for drug conspiracies. Rather, courts have utilized a chain metaphor.

An example is *United States v. Gantt*, 617 F.2d 831 (D.C.Cir.1980). The evidence established that the appellants had travelled from Washington, D.C. to Los Angeles to purchase narcotics. Other evidence established that the narcotics were later sold in D.C. The defendants claimed that these transactions were entirely distinct, establishing two conspiracies. The court disagreed. Certain defendants went to California to purchase narcotics, others prepared the drugs for sale in D.C., others distributed the drugs, and still others actually sold them. "The activities of each member and group in the organization meshed with those of the other members and groups. In short, the evidence disclosed a classic example of a narcotics sale and distribution conspiracy.... In those cases [relied on by appellants, e.g., *Kotteakos*], the evidence showed 'wheel-type' conspiracies, whereas the conspiracy here was the 'chain-type' conspiracy common in narcotics cases." 617 F.2d at 846 (citations omitted).

■ Under the chain analysis, the government need not prove a direct connection between all the conspirators. A single conspiracy may be established when each conspirator knows of the existence of the larger conspiracy and the necessity for other participants, even if he is ignorant of their precise identities. When the conspirators form a chain, each is likely to know that other conspirators are required. *E.g., United States v. Andrus*, 775 F.2d 825, 840–41 (7th Cir.1985); *United States v. Inadi*, 748 F.2d 812, 817 (3d Cir.1984) (citing W. LaFave & A. Scott, Handbook on Criminal Law 480–81 (1972)), *rev'd on other grounds*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

■ The chain metaphor, while helpful, does not end our analysis. The existence of a chain is only an aid in answering the ultimate question: whether a single conspiracy was demonstrated. A single conspiracy is proven if the evidence establishes that each conspirator had the specific intent to further the common unlawful objective. *United States v. Ras*, 713 F.2d 311, 314 (7th Cir.1983) (whether defendants "knowingly embraced a common criminal objective"); *see also Andrus*, 775 F.2d at 840 (applying *Ras* to chain conspiracy); *cf. United States v. Haldeman*, 559 F.2d 31, 112 (D.C.Cir.1976) (specific intent to further unlawful object of conspiracy must be shown), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

The existence of a chain helps us determine both the unlawful objective and the conspirators' intent. Unlike a wheel conspiracy, in which the interest of each spoke is unrelated to the interests of the other spokes, each link in the chain may rely upon the other links in furtherance of the common interest. The street dealer relies upon his supplier; the supplier relies upon

*his* supplier; and so on. The existence of such a "vertically integrated, loose-knit combination," *United States v. Bynum,* 485 F.2d 490, 495–96 (2d Cir.1973), *vacated & remanded on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), may raise the inference that each conspirator has agreed with the others (some whose specific identity may be unknown) to further a common unlawful objective, e.g., the distribution of narcotics.

■ Chain analysis must be used with care. Even in a vertically integrated combination, certain players may have performed activities wholly unrelated to the aims of the conspiracy. These unrelated activities may not be attributed to the co-conspirators, *Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946), and those with whom the "freelancing" conspirator dealt do not necessarily become members of the main conspiracy. Thus, even if we determine that a chain conspiracy exists, we may still conclude that certain actions were outside the chain and formed a separate conspiracy.

■ In determining whether the conspiracy was single or multiple, and which acts were committed in furtherance of the common conspiracy, we are aided by those courts that have isolated a variety of factors. The most important of these is whether the conspirators share a common goal, such as the possession and distribution of narcotics for profit. *Caporale,* 806 F.2d at 1500; *United States v. Dickey,* 736 F.2d 571, 582 (10th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). Another is the degree of dependence inherent in the conspiracy. *United States v. Cerro,* 775 F.2d 908, 914 (7th Cir.1985); *United States v. Adamo,* 742 F.2d 927, 932–33 (6th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed. 2d 975 (1985); *Dickey,* 736 F.2d at 582. Some courts have permitted the jury to infer the conspirators' knowledge of their link to other conspirators from the nature of a narcotics conspiracy. *United States v. Behrens,* 689 F.2d 154, 160 (10th Cir.), *cert. denied,* 459 U.S. 1088, 103 S.Ct. 573, 74

L.Ed.2d 934 (1982); *United States v. Smith,* 609 F.2d 1294, 1300 (9th Cir.1979); *United States v. Burman,* 584 F.2d 1354, 1356–57 (4th Cir.1978), *cert. denied,* 439 U.S. 1118, 99 S.Ct. 1026, 59 L.Ed.2d 77 (1979); *United States v. Moten,* 564 F.2d 620, 624–25 (2d Cir.), *cert. denied,* 434 U.S. 942, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977); *United States v. Taylor,* 562 F.2d 1345, 1352 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). For this reason, cases relied upon by appellants dealing with non-narcotics conspiracies, e.g., *United States v. Camiel,* 689 F.2d 31 (3d Cir.1982); *United States v. Butler,* 494 F.2d 1246 (10th Cir.1974); *United States v. Varelli,* 407 F.2d 735 (7th Cir.1969), *cert. denied,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972), are of limited relevance. A final factor of lesser significance is the overlap of participants in the various operations claimed to comprise a single conspiracy. *Caporale,* 806 F.2d at 1500; *Erwin,* 793 F.2d at 662–63. A single conspiracy conviction has been upheld, however, despite a "lack of significant overlap of some participants" when strong evidence established that a main player coordinated the narcotics importation and distribution enterprise. *United States v. Champion,* 813 F.2d 1154, 1166–67 (11th Cir.1987).

### C. *Sufficiency of the Evidence of a Single Conspiracy*

■ In this case, the evidence presented to the jury was sufficient to establish the existence of a chain conspiracy whose aim was to accumulate wealth by distributing cocaine. The identity and relationship of the major players in the conspiracy is summarized in the chart below. All appellants shared the conspiracy's objects and knew of their dependence on other conspirators, even though they may not have known the precise identity of all the other conspirators. Each appellant played a vital role in the conspiracy's success. Burns facilitated purchase, Tarantino and Bell facilitated distribution, and Black and Tarantino facilitated laundering of the profits into usable form. As will become apparent, however, each of the appellants also played other

roles in the conspiracy, and all knew of the collaboration of others.

We hold that the evidence was sufficient for the jury to conclude that the appellants joined in a single conspiracy. The defendants' activities relating to the purchase, distribution, and laundering of funds did not constitute separate conspiracies, but were undertaken in furtherance of the overarching objectives of the single conspiracy. Accordingly, we find no basis for appellants' claim that they have been substantially prejudiced by a material variance between the evidence introduced at trial and the facts alleged in the indictment.

### 1. Burns

■ Strickland was introduced to Burns by Black, Tr. 123–29, with whom Burns had had numerous prior dealings. Tr. 5391–93. At their first meeting in Miami, Burns asked Strickland if he was in town to buy cocaine. An extensive discussion of the cocaine trade ensued. Burns stated that he had confidence in Strickland because of their mutual friendship with Black. Tr. 166–71. Strickland returned to Burns' apartment the next day, when Burns introduced him to two men, Gene Cello and an unidentified Colombian, who could supply cocaine. Burns offered to broker cocaine deals for Strickland for a commission of

$2,000 per kilogram. Strickland then purchased a single kilo from Cello and the Colombian, which was transported to and distributed in Washington, D.C. Tr. 173–77.

After a subsequent purchase from Cello produced poor quality cocaine, Burns introduced Strickland to Armando Marulanda, a major Colombian importer. Marulanda offered to sell Strickland ten kilos of cocaine on credit, with a $2,000 per kilo commission to Burns. Marulanda's extension of credit to Strickland was a turning point in Strickland's cocaine trade. Never before had he been able to obtain such large quantities on consignment. Tr. 182–91. Burns thus was essential to the expansion and success of the conspiracy, and he benefitted directly by receiving commissions on each sale by Marulanda to Strickland.

Burns apprised Black of these transactions. Tr. 323–34. Strickland's purchases from Marulanda and Marcos Cadavid, an associate of Marulanda's, escalated over the course of the next months, which increased Burns' commissions. Tr. 197–213.

Soon after the first transaction, Strickland introduced his partner and co-conspirator, Steve Kupits, to Burns. Strickland stated that he and Kupits were distributing the cocaine "in different parts of the country." Burns responded: "Fine, no problem." Tr. 195–96. Burns knew of and endorsed the nationwide scope of the conspiracy.

Burns also was directly involved with the other conspirators. When Ribera, one of Strickland's distributors, took over Strickland's customers in the D.C. area while Strickland took an extended "vacation," Burns dealt directly with Ribera. Under Strickland's prodding, Burns "fronted" cocaine to Ribera, i.e., gave him cocaine on consignment. Burns also supplied Ribera with a courier to transport cocaine to the conspiracy's distributors in California. Tr. 1769–72, 1791. Burns himself directly provided the California conspirators with three kilos of cocaine. Tr. 2223–25. Burns also dealt with the Texas conspirators working with Kupits. Tr. 272–75. There was even evidence linking Burns to Tarantino's plan to launder money by investing it in a Haitian casino, Tr. 472, and Black's plan to launder money through investments in a New Jersey casino (the "Gateway Project"). Tr. 353–55.

The evidence was sufficient for a jury to conclude that Burns was an essential link in the distribution chain. He shared the conspiracy's goals, and knew of the nature and scope of the enterprise.

Burns argues that the government's evidence was based entirely on perjured testimony, a claim which the jury was entitled to reject. Brief for Burns at 7–21. He also argues that every act of the conspirators was a separate conspiracy of which he was no part. *Id.* at 37. The evidence was sufficient, however, for the jury to conclude that Burns was an essential link in a single chain.

We have considered carefully Burns' claim that prosecutorial misconduct "permeated the entire proceedings." *Id.* at 21. To a large extent, Burns' claim reiterates his other assignments of error, e.g., use of perjured testimony, attempt to deprive Burns of his *"pro se* status," and suppression of evidence favorable to him and material to guilt or punishment under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We discuss each of these arguments separately elsewhere in this opinion. We merely note here that we have found no obvious perjury on any material matter, much less knowing use of perjured testimony by the prosecutor. *See Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (prosecutor's knowing use of material perjured testimony, along with deliberate suppression of impeachment evidence, justifies collateral attack). The prosecutor was entitled to argue his interpretation of the evidence, and the jury was entitled to accept that interpretation.

2. Black

Strickland met Black after Black indirectly received a $13,000 loan from Strickland. At their first meeting, Strickland informed Black that he was a marijuana dealer, upon which Black suggested that

Strickland meet Burns (who later proved to be a major cocaine broker). Tr. 128. Black urged Strickland to transform the loan into an investment in Black's Gateway Project, and to increase the amount of the investment to $70,000. Black also stated he could help Strickland "clean up" his money, that is to say, to disguise its illegal source. Tr. 129–30. Strickland soon invested a total of $140,000 in the Gateway Project, all of it in cash. Tr. 5025–26. Later, Black asked Strickland to "come out of retirement" to generate an additional $800,000, and a further cash payment by Strickland of $500,000 followed shortly. Tr. 362–69.

Black claims that he was unaware of the illicit source of Strickland's funds. Brief for Black at 24–28. The jury was entitled to infer, however, that Black was well aware that Strickland's investment represented his cocaine profits: according to Strickland's testimony, (1) Black knew from the first that Strickland was involved in the drug trade; (2) Black introduced Strickland to Burns, a major cocaine broker; (3) Black knew of the developing relationship between Strickland and Burns (Black told Strickland he had heard from Burns that "things are going well with you two" (Tr. 323–24)); (4) Black touted the Gateway Project as a good way for Strickland to "clean up" his money (Tr. 129–30); (5) Strickland provided huge sums of cash to Black (Tr. 362–69), a fact that should have at least aroused suspicion (*cf. United States v. Nicholson*, 677 F.2d 706, 709 (9th Cir.1982), holding that large cash transactions without documentation, combined with refusal to describe investment, established sufficient circumstantial evidence to infer conspiracy); and (6) Black twice arranged for attorneys to represent conspirators arrested on cocaine charges (Tr. 668–69, 672).

Black was also involved in a series of financial transactions that the jury was entitled to conclude were "washes." Black offered to issue a check for cash provided by Strickland in order to permit Strickland to show a legitimate source of income. Black twice issued a Dunbar Corporation check for $3,000 in exchange for $3,000 cash (proceeds of cocaine sales) provided by Strickland. Tr. 338–43. Black also washed $60,000 to permit the financing of a land development project of Strickland, Kupits, and Maddux. Tr. 343–48.

Two final pieces of evidence are decisive in establishing Black's involvement in the conspiracy, if credited by the jury. First, in 1980, Black asked Strickland if he was still dealing in drugs. Strickland said he was not, because of a capital shortage. Black offered to arrange the necessary financing. Tr. 426–28. Second, in 1981, Black asked Strickland whether the Texas federal grand jury's investigation centered on the land development plan only, or if it also concerned the drug network. Because of the two $60,000 washes he provided in connection with that project, he feared he might be indicted. Tr. 397–403.

We have little trouble concluding that the jury was entitled to find that Black knew of the nature and scope of the conspiracy, joined in its aims, and facilitated its success.

Black further claims that even if he knew of the conspiracy, he only dealt in an "article of free commerce, i.e., money." Brief for Black at 28. He argues that a "conspiracy conviction under 21 U.S.C. §§ 841 and 846 requires more evidence of involvement in the conspiracy than mere handling of the proceeds of an illegal drug scheme." Brief for Black at 29. In a related argument, Black maintains that money laundering is not a proscribed offense under section 841; laundering is specifically criminalized by other statutes (*e.g.*, 18 U.S.C. §§ 1952(a) (1982), 1956(a)(1) (Supp. IV 1986), 1962(a) (1982), and 21 U.S.C. § 854 (Supp. III 1985)), under which Black was not charged. *Id.* at 31–37.

This claim misconstrues the nature of the conspiracy as charged. The conspiratorial agreement was proscribed by section 841 because one of its essential aims was the distribution of cocaine. The laundering of funds was a *part* of the plan to distribute cocaine; the conspirators, including Black, well knew that the cocaine money had to be "cleaned up" to be useful to them. Tr. 129–30. Black's aid in launder-

ing the cocaine profits thus facilitated the attainment of the conspiracy's goals; money launderers play an essential part in a narcotics chain conspiracy. *See, e.g., United States v. Dela Espriella,* 781 F.2d 1432, 1436 (9th Cir.1986); *United States v. Orozco–Prada,* 732 F.2d 1076, 1080 (2d Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984); *United States v. Metz,* 608 F.2d 147, 153 (5th Cir.1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed. 2d 24 (1980). The government is not required to prove that every act taken in furtherance of the conspiracy is illegal, much less that it is specifically proscribed by the conspiracy statute. *See Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942).

3. Tarantino

Tarantino participated in two aspects of the conspiracy: the distribution of cocaine and the laundering of proceeds.

Tarantino's involvement in the distribution of cocaine for Strickland began in the summer of 1980, when he introduced Strickland to Sonny Croughn, with the remark that Croughn could "sell a lot of coke." Tr. 438–40. Strickland agreed to provide cocaine to Croughn through Tarantino. Tr. 444–46, 458. Following a phone call from Tarantino, Strickland travelled from the District of Columbia to New Jersey to deliver cocaine to Croughn. Strickland "fronted" the cocaine to Croughn, who later paid Strickland through Tarantino. Tr. 457–61. Similar transactions followed. Tr. 462–66. In some of these, Strickland was accompanied by other members of the conspiracy, e.g., Baker (Tr. 2412–19) and Kohn (Tr. 477–78). In all of these instances, Tarantino was present at the delivery of the cocaine.

Tarantino also was aware of the national scope of the conspiracy. At the end of 1980, Strickland called Croughn from Houston and asked if Croughn could dispose of an excess kilo of cocaine. Tarantino immediately called back and arranged for a courier to pick up the cocaine. Strickland met the courier, and Croughn and Tarantino confirmed the delivery. Tr. 479–83.

Tarantino's second level of involvement was his role in attempting to launder the proceeds of the conspiracy's cocaine sales. Strickland first met Tarantino in connection with Black's casino project (the Gateway Project; *see supra* at 1395). At first, Strickland concealed from Tarantino the source of the funds he was investing in the Gateway Project. But when Tarantino met Strickland in Las Vegas in 1980, he told Strickland he was aware that Strickland and Burns had been selling drugs. He thanked Strickland for his help in supporting the Gateway Project, and later advised him to make further investments in the casino. Tr. 437–38, 1208, 375–76. At a subsequent meeting in New Jersey concerning the Gateway Project, Tarantino introduced Strickland to Croughn as a man who could "sell a lot of coke." Tr. 438–40. Tarantino at least knew of, and arguably urged and facilitated Strickland's investment in the Gateway venture. Given Tarantino's knowledge of the nature of Strickland's business, he also would have known that Strickland's investments in Gateway were made to clean up his money. Tarantino knew of and condoned this aspect of the conspiracy's goals.

Tarantino managed a separate casino project in Haiti. He encouraged Strickland to invest in this project as well and credited the proceeds of Strickland's sales to Croughn to the Haitian project. Tr. 470, 475–77. Strickland invested $300,000 in the Haitian project, thinking it a good laundering device. Tr. 470–71.

Tarantino was familiar with other major players in the conspiracy. He knew Black through the Gateway Project. Tr. 434–36. He was acquainted with Bell, and was working with him on a separate investment project. Tr. 538–538A. Tarantino and Kohn, the conspiracy's bookkeeper, also had extensive discussions concerning the Haitian and other potential investment projects. Tr. 521, 3302–10.

Tarantino argues that, at most, the evidence established a conspiracy between Strickland, Croughn, and Tarantino to dis-

tribute cocaine, and an agreement by Strickland to invest $300,000 in the Haitian project. This conspiracy, says Tarantino, did not involve Black and Burns and was therefore totally separate from the conspiracy alleged in the indictment. Brief for Tarantino at 44. The jury concluded otherwise, however, and the evidence is sufficient to support its verdict. Tarantino was aware of Strickland's acquisition and distribution of cocaine; it is immaterial that he did not know the precise identities of all the other conspirators. As we discuss elsewhere in this opinion, Black and Burns were sufficiently aware of and entered into the goals of the conspiracy, even if they did not know the full extent of Strickland's dealings with Tarantino.

### 4. Bell

 The evidence clearly established that Bell was the conspiracy's major distributor of cocaine in Washington, D.C. *See, e.g.,* Tr. 98–118, 526–29. Bell does not seriously dispute this now, but claims he was unaware of other aspects of Strickland's operations, including the distribution of cocaine elsewhere in the nation and the laundering of the cocaine profits. Brief for Bell at 35–39.

The government was not obliged to prove that Bell knew every detail of the conspiracy. All that is required is that the evidence establish that he knew others were involved and that his own benefits depended upon the success of the entire venture. *See United States v. Sisca,* 503 F.2d 1337, 1345 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974) (cited in Brief for Bell at 35), and *supra* at 1392–93.

Bell had extensive dealings not only with Strickland, but also with other players in the conspiracy's distribution chain. He received cocaine deliveries from Ribera (Tr. 1726, 1740–43), acted as a money courier between Strickland and Kastrenakes (Tr. 532–33), and distributed cocaine supplied by Kastrenakes (Tr. 535–36). Bell was at least acquainted with Kupits and Kohn in Texas (Tr. 3269–70) and Tarantino in New Jersey (Tr. 538–538A). From this evidence,

a jury could conclude that Bell was aware of the nationwide conspiracy and his dependence on its continued success. The existence of multiple distribution points does not, in itself, establish multiple conspiracies. *See, e.g., United States v. Jenkins,* 779 F.2d 606, 616–17 (11th Cir.1986); *United States v. Bibbero,* 749 F.2d 581, 587 (9th Cir.1984), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985); *United States v. Vila,* 599 F.2d 21, 24 (2d Cir.), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979).

Finally, although the evidence did not establish that Bell directly participated in the laundering phase of the conspiracy, he was aware that the continued success of the conspiracy depended upon effective means of "cleaning up" its funds. The laundering of funds was a further link in the chain of which Bell was a part, and the conspirators' acts in laundering the funds were thus attributable to Bell. *Pinkerton,* 328 U.S. at 646–47, 66 S.Ct. at 1183–84.

## II. SEVERANCE

Each appellant argues that the trial court should have granted his motion for severance. We review the denial of a motion to sever under an abuse of discretion standard. *United States v. Butler,* 822 F.2d 1191, 1194 (D.C.Cir.1987).

### A. *Disparity in Evidence*

 Severance is required in two situations. First, when the evidence against the other defendants was "far more damaging," the prejudicial spillover may have deprived a defendant of a fair trial. *Id.* (quoting *United States v. Sampol,* 636 F.2d 621, 645 (D.C.Cir.1980)). The trial judge is usually in the best position to evaluate the resulting degree of prejudice, and jury instructions generally are sufficient to minimize any disparities in evidence. *Butler,* 822 F.2d at 1194; *United States v. Wright,* 783 F.2d 1091, 1096 (D.C.Cir.1986).

Although each appellant claims the government's case against him was far weaker than that against the other appellants, the evidence was not so dramatically

disparate that the judge abused his discretion in denying the motions to sever. We have rarely held that a district court improperly denied a motion to sever. In *United States v. Mardian*, 546 F.2d 973 (D.C.Cir.1976) (en banc), Robert Mardian was tried along with the other Watergate conspirators. Mardian's participation in the conspiracy was brief, and the evidence against him was slight. Nevertheless, we held that severance was *not* required *until* Mardian's lawyer became ill during the trial. 546 F.2d at 979–80.

In *Sampol*, 636 F.2d 621, Ignacio Sampol was tried only for misprision of a felony and making false statements, whereas his co-defendants were tried for conspiracy and murder. Because of the quantity and inflammatory nature of the testimony against the co-defendants, the risk of a transference of their guilt was significant. Moreover, the testimony created a false impression that Sampol was involved in the conspiracy. 636 F.2d at 644–48.

In *United States v. Bruner*, 657 F.2d 1278 (D.C.Cir.1981), however, the kingpin of the conspiracy was tried along with his confederates. Lynch directed the operation, in which groups of overweight women were sent to doctors in various cities to obtain prescriptions for Dilaudid and Preludin. These drugs were later illegally resold. Although the evidence against Lynch was "substantial," there was also "independent and substantial evidence" that the co-defendants participated in the conspiracy. The disparity in the weight of the evidence was not so dramatic as to require a severance. 657 F.2d at 1290–91.

■ We also distinguished *Mardian* and *Sampol* in *United States v. Sutton*, 801 F.2d 1346 (D.C.Cir.1986). There, we held the trial judge did not abuse his discretion in denying a motion for severance when the charges required the "presentation of much of the same evidence, testimony of the same witnesses, and involve[d] two defendants who [were] charged, *inter alia*, with participating in the same illegal acts." 801 F.2d at 1365.

Here, too, there was substantial and independent evidence of each appellant's sig-

nificant involvement in the conspiracy. Once each appellant was tied to the conspiracy, the acts of each conspirator in furtherance of the conspiracy's aims were attributable to all. The evidence and the charges were substantially overlapping, but the overlap was caused by the involvement of each appellant in a single scheme. In these circumstances, severance was not required.

### B. Conflicting Defense Theories

Severance may also be required in cases in which co-defendants rely on defenses that are mutually contradictory. "[T]he denial of a severance motion generally constitutes an abuse of discretion when 'the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *Wright*, 783 F.2d at 1094 (quoting *Rhone v. United States*, 365 F.2d 980, 981 (D.C.Cir.1966)). In *Wright*, two men were charged with kidnapping. Wright intended to claim insanity, and Moss duress, but this in itself did not establish the requisite conflict requiring severance. Wright further claimed that a substantial factor contributing to his mental illness was the murder of his lover. But Moss claimed that Wright had said that he himself had killed his lover. According to Moss, Wright's statement lent plausibility to his alleged threats, which forced Moss to join in the kidnapping plan. Although we recognized the conflict to be "a real one," the defenses were not "so contradictory as to raise an appreciable danger that the jury would convict because of the inconsistency." The inconsistency "would not logically require a jury to find Wright guilty if it acquitted Moss." 783 F.2d at 1095.

■ The conflicts between appellants in the instant case are far less severe, and not such as to require severance. For example, Black claims that restrictions placed on impeachment of Strickland resulted from conflicts with co-defendants. Black's counsel was not permitted to inquire about Strickland's knowledge of the murder of a Colombian drug source. But this restric-

tion was imposed by the district court not because of the tendency to implicate Burns (as Black claims), but because it was "not probative of anything." Tr. 713. Similarly, the court restricted inquiry on cross-examination as to witnesses' fears of other defendants. *See, e.g.,* Tr. 3574–77. The court imposed these restrictions partly to avoid unfair prejudice to the co-defendants, but mainly because the probative value of the evidence was slight. Finally, although the trial court refused to allow Bell's counsel to cross-examine Strickland regarding an alleged plot to kill Kupits because the probative value was outweighed by the danger of prejudice to Black, *see infra* at 1405–07, we cannot say that the decision not to sever Bell (or Black) from the other defendants based on this prejudice was an abuse of discretion. The conflicts between the defendants in this respect were not so severe as to require severance.

### III. JURY INSTRUCTIONS

#### A. *Single Versus Multiple Conspiracies*

■ After a thorough instruction on the elements of conspiracy, the trial judge told the jury:

[I]n the context of that instruction as to the elements of a conspiracy, you're further instructed with regards [sic] to this alleged conspiracy offense, that proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the single conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendants as to that charge. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.

If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit the defendant. In other words, to find a defendant guilty you

must find that he was a member of the conspiracy charged in the indictment and not some other, separate conspiracy.

Tr. 6444–45. Taking the instructions as a whole, this charge was proper. *E.g., United States v. Darby,* 744 F.2d 1508, 1542 (11th Cir.1984) (approving identical instruction), *cert. denied,* 471 U.S. 1100, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985); *cf. United States v. Gantt,* 617 F.2d 831, 846 (D.C.Cir. 1980) (approving substantially similar instruction).

Appellant Bell nevertheless complains that Judge Hogan did not adopt the precise language of his proposed instruction, especially the following:

A conspiracy may ... include two or more separate agreements ... providing the participants in the separate agreements are joined together by their knowledge of the essential features and scope of the overall conspiracy and by the common goal. Where the participants in separate agreements are not so joined, they are not members of a single, overall conspiracy....

*See United States v. Bailey,* 607 F.2d 237, 243 n. 14 (9th Cir.1979) (the source of the instruction), *cert. denied,* 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980). Bell argues that the instruction given "provided no guidance to the jury as to how to determine whether, in fact, there was more than one conspiracy." Brief for Bell at 42.

■ We do not decide the correctness of the *Bailey* instruction, as the instruction given here was adequate. The trial court is required to give a proper instruction, and to instruct on the defendant's theory of the case if supported by the evidence. *United States v. Payne,* 805 F.2d 1062, 1067 (D.C. Cir.1986). The court is not required to give the instruction in the specific language requested by the defendant. *Id.* Judge Hogan did instruct the jury on the elements of conspiracy, Tr. 6432–35, so that the jury had a proper basis for determining whether the agreements between the various conspirators comprised one or several conspiracies. The adequacy of the instructions must be determined by looking at the charge as a whole. *E.g., United States v.*

*Douglas,* 818 F.2d 1317, 1321–22 (7th Cir. 1987). The slight variation from the proposed instructions did not substantially prejudice the appellants, particularly in view of the strength of the evidence of a single conspiracy. *Cf. United States v. Davenport,* 808 F.2d 1212, 1217–18 (6th Cir.1987) (because of strength of evidence and adequacy of instruction on elements of conspiracy, failure to give specific instruction on multiple conspiracies was harmless error).

▮ Finally, Bell's claim that the court "fail[ed] to charge the jury that if it found that multiple conspiracies existed, it should disregard all evidence introduced by the government relating to conspiracies other than the one in which the defendant was involved," Brief for Bell at 42, is inaccurate. Judge Hogan instructed the jury as follows:

> [I]n determining whether a particular defendant was a member of the conspiracy, if any existed, you may consider only his own acts and statements. A defendant cannot be bound by the acts or declarations of the other participants unless and until it is established that a conspiracy existed and the defendant was one of its members.

Tr. 6434. This instruction adequately conveyed the importance of segregating evidence between defendants. Although the jury was not instructed in the precise terms Bell desires, it was told that the defendants were bound by co-defendants' acts only if they were found to be members of the same conspiracy.

1. The Travel Act provides in relevant part:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
 (1) distribute the proceeds of any unlawful activity; or
 \* \* \* \* \* \*
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined ... or imprisoned ..., or both.

**B. *The Travel Act***

▮ The Travel Act, 18 U.S.C. § 1952 (1982),[1] broadly forbids travel in interstate commerce or the use of facilities of interstate commerce for the purposes of furthering "any unlawful activity." 18 U.S.C. § 1952(a). The statute defines "unlawful activity" as "any business enterprise" involving narcotics or controlled substances, 18 U.S.C. § 1952(b)(1), and the courts have construed "business enterprise" to require "a continuing course of conduct rather than sporadic casual involvement in a proscribed activity." *United States v. Kendall,* 766 F.2d 1426, 1434 (10th Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986); *United States v. Corbin,* 662 F.2d 1066, 1072 (4th Cir.1981). *See also* H.R.Rep. No. 966, 87th Cong., 1st Sess. 3 (1961) ("[I]ndividual or isolated violations would not come within the scope of this bill since they do not constitute a continuous course of conduct so as to be a business enterprise.") Black attacks his conviction under the Travel Act on the ground that the trial judge's charge failed to tell the jury of the need to find a continuous course of conduct. Because Black failed to object at trial we could reverse only if we found "plain error," which we do not.[2]

The trial court's instructions to the jury on the "unlawful activity" element of the Travel Act did not specifically mention the "business enterprise" aspect of the offense:

> In this case, the unlawful activity is alleged to be the distribution of cocaine and other controlled substances and the conspiracy to distribute cocaine and oth-

 (b) As used in this section "unlawful activity" means (1) any business enterprise involving ... narcotics or controlled substances....

2. Tarantino was also convicted of four counts under the Travel Act, but does not raise the issue of the propriety of the instructions on appeal. We are entitled to notice such an error under a "plain error" standard. *See Silber v. United States,* 370 U.S. 717, 718, 82 S.Ct. 1287, 1288, 8 L.Ed.2d 798 (1962). As Tarantino, like Black, raised no timely objection at trial, the result is the same as for Black.

er controlled substances.... You are instructed as a matter of law that the distribution of cocaine and other controlled substances are violations of the laws of the United States.

Tr. 6462–63. Because this instruction did not mention the "business enterprise" requirement or make clear that the jury had to find a continuous course of criminal conduct, it was an incomplete discussion of the "unlawful activity" element of the Travel Act. *United States v. Rinke,* 778 F.2d 581, 586 (10th Cir.1985) (specific findings as to the existence of a "business enterprise" essential to conviction at bench trial); *United States v. Kaiser,* 660 F.2d 724, 731 (9th Cir.1981) (error to refuse to instruct the jury that it must find a continuous course of criminal conduct to convict on Travel Act counts), *cert. denied,* 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674 (1982); *cf. United States v. Gallo,* 782 F.2d 1191, 1195 (4th Cir.1986) (error to fail to give any definition of "unlawful activity").

The defendant did not, however, object at trial to this definition of "unlawful activity." [3] Consequently, reversal of the trial court would require a finding of plain error. *United States v. DeBango,* 780 F.2d 81, 84 (D.C.Cir.1986). *See also* FED.R.CRIM. P. 30 ("No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."); FED.R. CRIM.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.") The Supreme Court has recently admonished that the plain error exception is an exceedingly narrow one, to be used only " 'to correct particularly egregious errors,' *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982), those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings,' *United States v. Atkinson,* 297 U.S. [157,] 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 [ (1936) ]." *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985).

■ The inadequacy of the court's charge on the "unlawful activity" aspect of the Travel Act does not rise to the level of plain error. First, although the instruction did not contain the specific words "business enterprise" or "continuous course of conduct," the references to "distribution of cocaine" and the "conspiracy to distribute cocaine" indirectly expressed those concepts. Although both distribution and conspiracy may, of course, consist of sporadic activities, we think that in the context of this case the jury could only understand the instructions to refer to the massive ongoing conspiracy alleged in the indictment. Second, and more fundamentally, the jury convicted all of the defendants—including Black and Tarantino—on Count One of the indictment, which alleged a continuous, vertically integrated, geographically widespread operation to acquire, distribute and sell cocaine, and to launder the proceeds. The conspiracy spanned several years, and the jury heard evidence showing that Black and Tarantino were each involved in more than a few sporadic transactions during this period. The convictions for this wide-ranging conspiracy render it essentially inconceivable that Black or Tarantino was harmed by the court's failure to more clearly emphasize the "continuous

**3.** Black's trial counsel initially submitted requested instructions on the elements of the Travel Act that closely paralleled those later given by the trial court; the requested instructions defined the unlawful activity in the case as "the distribution of cocaine and other controlled substances." Black's Requested Jury Instruction No. 11. He also submitted an instruction that essentially restated the statutory language, including the definition of "unlawful activity" as a "business enterprise." Black's Requested Instruction No. 10. Black's counsel did not, however, refer to the business enterprise require-

ment at the instructions conference. Tr. 5820–6039. Moreover, although he objected to the judge's instructions on unlawful activity at a conference following the charge to the jury, his grounds were that the alleged narcotics conspiracy could not constitute the unlawful activity for purposes of the Travel Act, not that the business enterprise element was missing. Tr. 6474–75. In sum, Black's trial counsel never took exception to the judge's instructions on the grounds urged here either before or after the charge to the jury.

course of conduct" aspect of "unlawful activity." Finally, in evaluating whether the instructions constituted plain error, we may ourselves evaluate the strength or weakness of the evidence against the defendants on the Travel Act. *Young*, 470 U.S. at 19–20, 105 S.Ct. at 1048 (plain error reversal unwarranted because overwhelming evidence of defendant's fraud showed that prosecutor's improper remarks did not undermine the fairness of the trial). In this case the evidence showed beyond any reasonable doubt that Tarantino and Black were each a vital actor in an ongoing criminal business enterprise to acquire, distribute, sell, and profit from illicit drugs. *See supra* at 1395–98.

That the error involved an omission of essential ingredients of the crimes makes no difference in this analysis. In the related area of "harmless error" analysis, applicable where proper objection has been made and where accordingly the standards must be more stringent, the Supreme Court has made clear a conviction may be sustained even when the trial court's instructions allow the jury to convict without finding "each element of the crime under the proper standard of proof." *Pope v. Illinois*, —— U.S. ——, 107 S.Ct. 1918, 1922 n. 7, 95 L.Ed.2d 439 (1987), citing *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). As the facts that the jury necessarily found established guilt beyond a reasonable doubt, *cf. Pope*, 107 S.Ct. at 1922, the convictions on the Travel Act counts must stand.

### C. *The Cash Transaction Reports Instruction*

 Defendant Black also objects to the trial court's instructions regarding the filing of cash transactions reports ("CTR"s) under the Currency Transaction Reporting Act ("CTRA"), 31 U.S.C. § 5313(a) (1982). This requires banks to report certain transactions as specified by the Treasury Department, which has set a threshold of $10,000. *See* 31 C.F.R. § 103.22 (1987). Black's objections are that the court did not make it sufficiently

clear, first, that only the financial institution has a duty to file CTRs, and second, that the depositors are completely free to structure their transactions so as to keep under the threshold. We find no error.

The court instructed the jury as follows: The law provides that a financial institution shall file a report of each transaction in currency of more than $10,000. The duty and the responsibility to obtain the required information, fill out and file the required currency transaction report is on the banking institution in the case of bank deposits exceeding $10,000. The depositor, that is the person making the deposit, does not file the report.

Tr. 6421. These instructions obviously make it clear that depositors do not have a duty to file CTRs, so we turn to the second objection.

 Here Black specifically objects to the trial court's refusal to give his Requested Instruction No. 8, to the effect that the law does not prohibit a person from structuring his transactions in such a way as to avoid the filing of CTRs. We note at the outset that Black's view of the law is hotly disputed in the courts of appeal. *Compare United States v. Nersesian*, 824 F.2d 1294, 1311 (2d Cir.1987); *United States v. Puerto*, 730 F.2d 627, 631 (11th Cir.), *cert. denied*, 469 U.S. 847, 105 S.Ct. 162, 83 L.Ed. 2d 98 (1984); *United States v. Tobon–Builes*, 706 F.2d 1092, 1098 (11th Cir.1983) *with United States v. Larson*, 796 F.2d 244, 246 (8th Cir.1986); *United States v. Reinis*, 794 F.2d 506, 508 (9th Cir.1986); *United States v. Varbel*, 780 F.2d 758, 762 (9th Cir.1986); *United States v. Anzalone*, 766 F.2d 676, 681 (1st Cir.1985). Even if we assume that the depositor has no legal duty not to structure his transactions so as to avoid the filing of CTRs, however, we still conclude that omission of the requested instructions was not error. The prosecution did not charge Black with substantive violations of the CTRA.[4] Though the prosecutor made references to Black's evident efforts to keep below the trigger amount, he did so exclusively to support the inference that Black wished to avoid

---

4. Black was tried and acquitted for offenses under the CTRA in a separate trial.

the governmental scrutiny that would follow if the bank filed a CTR with the federal government each time he deposited proceeds of drug sales. Tr. 6082–83, 6085–90, 6354–55. Thus the government claim was that these otherwise apparently lawful acts were unlawful only because they were carried out in furtherance of a conspiracy.[5]

Clearly many acts that are by themselves perfectly legal may constitute overt acts manifesting participation in an illegal conspiracy, C. TORCIA, 4 WHARTON'S CRIMINAL LAW § 728 at 538 (1981). The jury need not be informed that all such acts are in the normal course of things perfectly legal. For instance, where conspiracy to rob a bank is charged and one member is assigned to "case the joint" by driving around the bank, it would be absurd to argue that the trial court must explain that driving a car near a bank is legal. In the absence of either a charge against Black under the CTRA itself or insinuations by the prosecutors or the court that Black's actions were illegal *apart from* their connection to the conspiracy, we find no error in denial of the proposed instructions.

D. *The Missing Witness Instruction*

Burns argues that the trial court should have given a "missing witness" instruction (suggesting an inference adverse to the government), or allowed Burns' counsel to note for the jury the absence of Steve Kupits, Nancy Strickland and many other witnesses that counsel at trial vaguely characterized as having a special "relationship" with the government. *See, e.g.,* Tr. 5985. The decision to refuse a missing witness instruction rests within the discretion of the trial court. *United States v. Montoya,* 676 F.2d 428, 431 (10th Cir.), *cert. denied,* 459 U.S. 856, 103 S.Ct. 124, 74 L.Ed.2d 108 (1982), and nothing in this case suggests any abuse of that discretion.

First, an instruction or inference that the missing witness' testimony would be unfavorable to the government is generally permissible only when it is within

the government's exclusive power to call the witness to testify. *Id.* In the instant case, Burns had every opportunity to call these witnesses; indeed, the trial court at one point specifically questioned Burns as to why he could not call them. Tr. 5859. Burns has made no specific allegation that any of these potential witnesses were in fact unavailable to the defense, and, contrary to Burns' assertion, no automatic inference of exclusive government control arises from the fact that witnesses are acting as government informants, *DeBango,* 780 F.2d at 84 (informant equally available to prosecution and defense); *Montoya,* 676 F.2d at 431 (same), or from a grant of immunity from prosecution, *United States v. Keplinger,* 776 F.2d 678, 702 (7th Cir. 1985), *cert. denied,* 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986).

Second, the trial court itself was responsible for the non-appearance of at least some of these possible witnesses; it restricted the government's intended presentation in the interest of avoiding cumulative evidence. Tr. 5864, 5990–91. *Cf. United States v. Jennings,* 724 F.2d 436, 446 (5th Cir.) (missing witness instruction not justified if testimony of witness not called is likely to have been cumulative or corroborative), *cert. denied,* 467 U.S. 1227, 104 S.Ct. 2682, 81 L.Ed.2d 877 (1984).

On these facts the trial court plainly did not abuse its discretion in declining to invite, or to allow defendants to invite, an inference against the government.

E. *Strickland's Guilty Plea*

Strickland testified at trial that he had pleaded guilty to the same conspiracy counts for which the defendants were being tried. Tarantino contends that the trial court should have informed the jury that they should not consider Strickland's guilty plea in assessing the defendants' guilt or innocence.

A government witness' guilty plea obviously may not be used as substan-

---

5. On occasions the prosecutor suggested that Black's actions in structuring his deposits to avoid the bank's filing of CTRs were illegal, but only, so far as we can determine, in colloquies with the court out of the earshot of the jury. Tr. 6027–31, 6114–16, 6161.

tive evidence of the guilt of defendants, but the plea is equally obviously admissible to show the witness' acknowledgement of his role in the offense and to reflect on his credibility. *United States v. Roth,* 736 F.2d 1222, 1226 (8th Cir.), *cert. denied,* 469 U.S. 1058, 105 S.Ct. 541, 83 L.Ed.2d 429, 433 (1984). In some instances—most obviously where there is a serious risk that the plea itself may be taken by the jury to support the defendants' guilt—a limiting instruction may be necessary to avoid prejudice. *Wallace v. Lockhart,* 701 F.2d 719, 725–26 (8th Cir.), *cert. denied,* 464 U.S. 934, 104 S.Ct. 340, 78 L.Ed.2d 308 (1983). At trial, however, Tarantino's counsel neither requested limiting instructions nor objected to the court's failure to give such instructions. Therefore, we could reverse only if the omission were plain error. *De-Bango,* 780 F.2d at 84; FED.R.CRIM.P. 30; FED.R.CRIM.P. 52. *See also supra* at 1402.

Here the defendants were not disadvantaged in any significant way by the omission of the instructions. The government never attempted to argue or even hint that Strickland's guilty plea had any bearing on the defendants' guilt or innocence. *Wallace v. Lockhart,* 701 F.2d at 726; *cf. United States v. Fleetwood,* 528 F.2d 528, 532–33 (5th Cir.1976) (government's emphasis on witness' guilty plea was prejudicial). Moreover, the overwhelming evidence of Tarantino's involvement in the conspiracy negates any possible harm from Strickland's statement. Failure to instruct on the issue was not plain error. *United States v. Martin,* 790 F.2d 1215, 1219 (5th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 231, 93 L.Ed.2d 157 (1986); *United States v. Smith,* 790 F.2d 789, 793–94 (9th Cir. 1986); *Roth,* 736 F.2d at 1226–27.

## IV. RESTRICTIONS ON CROSS-EXAMINATION

The defendants have challenged several rulings of the trial court restricting the scope of cross-examination of government witnesses. We address the various arguments separately below. We note at the outset, however, that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). *See* Fed.R.Evid. 611. Appellate review under the harmless error doctrine is to "focus[ ] on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Van Arsdall,* 106 S.Ct. at 1436–37.

In *Van Arsdall* the Supreme Court found a breach of the Confrontation Clause when the trial court "prohibited *all* inquiry into the possibility that [a key prosecution witness] would be biased as a result of the State's dismissal of his pending public drunkenness charge." 106 S.Ct. at 1435 (emphasis in original). But it also made clear that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 1435 (quoting *Delaware v. Fensterer,* 474 U.S. 15, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (emphasis in original)). Of course one might find a prohibition of "all inquiry" into almost any specific subject simply by defining the subject narrowly, but such a reading would plainly conflict with the Court's observations on the trial court's right to impose reasonable limits. Limits imposed in the interest of avoiding prejudice to a defendant (as in one instance here) are especially likely to cut off what might be loosely called a "subject," since such limits will typically foreclose reference to some discrete event that carries a risk of prejudice. Accordingly, we believe that we must conduct our Confrontation Clause inquiry with some consideration of the countervailing values.

### A. *Strickland's Plan to Murder Kupits*

The trial court refused to allow Bell's counsel to cross-examine Strickland about an alleged plot, involving Strickland, Black, Kohn, Ribera and Kastranakes, to hire a

hit man to murder Kupits in Texas. The supposed rationale for the plan was to prevent Kupits from testifying as a government witness. Tr. 1256–72. Bell asserts that this ruling was an abuse of the trial court's discretion.

Under FED.R.EVID. 608(b), specific instances of conduct may, in the discretion of the trial court, be inquired into on cross-examination "if probative of truthfulness or untruthfulness." Although the government argues that the plan to kill Kupits is not probative at all of Strickland's credibility, we cannot agree. To be sure, the planning or commission of a crime of violence without more is not usually thought to bear on a witness' veracity. *See* J. WEINSTEIN & M. BERGER, 3 WEINSTEIN'S EVIDENCE § 608(05) at 608–45 to 608–46 (1987). For instance, in *United States v. Young*, 567 F.2d 799 (8th Cir.1977), a case heavily relied upon by the government, the Eighth Circuit held that it was not an abuse of discretion to refuse to allow cross-examination of a witness regarding her attempt to have her ex-husband killed. There the court held that the attempted murder was "not relevant to veracity and honesty." *Id.* at 803. The viewpoint suggests a strong judicial concern over the drawbacks of allowing such inquiries; surely readiness to kill others for one's personal advantage, of any kind, signifies an egotism that in turn signifies a readiness to blur the truth when it is personally advantageous to do so. Judicial exclusion of such material is not suf-

ficiently explained by any lack of logical connection to credibility.

■ Nonetheless, we think that a murder plan aimed at stamping out evidence impugns a witness' credibility more directly than murder plans generally. *Young* is therefore not controlling; nowhere in that case was there any suggestion that the witness had wanted her former spouse killed to prevent him from testifying, or in any way to obstruct justice. We think the excluded evidence bears sufficiently on credibility that if the only drawback to admission were the universally applicable ones—diversion of attention, confusion, consumption of time—exclusion would likely be an abuse of discretion. *See* Fed.R. Evid. 403 (proper to exclude relevant evidence where probative value outweighed by various negative features); *United States v. Lavelle*, 751 F.2d 1266, 1277 (D.C. Cir.1985) (trial court's balance reversible only for abuse of discretion), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1986).

■ Here, however, a substantial additional factor tilted the balance against inclusion. Strickland's testimony could have been highly prejudicial to Black, who was implicated in the plot to kill Kupits. Indeed, evidence of a conspiracy to kill a co-conspirator could have prejudiced even the defendants not implicated in the plot. Given that the defendants took advantage of numerous opportunities to impeach Strickland in other ways [6]—the defendants'

---

6. Burns' counsel cross-examined Strickland as to his role in the drug trade, Tr. 563–615, past income tax evasion, Tr. 647–62, 677–78, the possibility that Strickland married his wife in order to take advantage of the spousal privilege, Tr. 735–36, prior inconsistent statements to a government agent, Tr. 789–95, 800–02, 808–12, 814–16, 822–26, 828–34, 839–41, 860–66, 898–904, 906–08, prior inconsistent statements in the first trial (which had ended in a mistrial), Tr. 845–52, 859, 885–88, 893–98, and past statements to the grand jury, Tr. 866–70, 875, 879–83, 909–12. Black's counsel cross-examined as to past drug use, Tr. 928–29, 1006–07, tax evasion, Tr. 935–40, Strickland's role in the drug trade, Tr. 946–54, Strickland's agreement with the government, Tr. 954–69, 980–90, past statements to the grand jury, Tr. 1020–23, 1042–48, prior inconsistent statements at the first trial, Tr. 1027–29, 1036–42, Strickland's preparation for

testifying, Tr. 1055, and a prior statement to a Mr. Hessler regarding Black, Tr. 1081–82. Tarantino's counsel cross-examined Strickland regarding the use of aliases, Tr. 1125–26, 1183, his past use of hallucinogenic and other drugs, Tr. 1156–60, the drug smuggling ring, Tr. 1161–71, prior statements to the grand jury, Tr. 1214–15, 1231–34, 1237–40, 1253–59, 1269–73, inquiries to Tarantino regarding legal representation, Tr. 1287–89, and Strickland's and others' plea agreements with the government, Tr. 1294–96. Finally, Bell's attorney cross-examined as to Strickland's plea bargain and relationship with the government, Tr. 1420–27, 1434–38, 1440–47, 1457–69, Strickland's income from the conspiracy and tax evasion, Tr. 1470–99, inconsistent statements before a grand jury, Tr. 1509–12, Strickland's demeanor and credibility in court, Tr. 1524–26, his past lies in various situations, Tr. 1526–36, past drug use, Tr. 1536–40, and

cross-examination of Strickland took five days and covered nearly 1,000 pages of transcript, Tr. 563–1550—and bearing in mind the demands of the Confrontation Clause, we think Judge Hogan's balance entirely suitable.

### B. *Strickland's Benefits from the Witness Protection Program*

■ Bell contends that restrictions imposed by the trial court "effectively prevented" his counsel from cross-examining Strickland about the benefits Strickland received in the Witness Protection Program. Bell is right, of course, to point out that a defendant must be given a reasonable opportunity to cross-examine a government witness as to any agreement with the prosecution. *United States v. Greenwood,* 796 F.2d 49, 54 (4th Cir.1986); *United States v. Sampol,* 636 F.2d 621, 660 (D.C.Cir.1980). The right to confront prosecution witnesses is not, however, absolute. Reasonable restrictions may be imposed, *see Van Arsdall,* 106 S.Ct. at 1435, and here we find those of the trial court eminently reasonable.

■ Contrary to Bell's contention, the trial court did not totally preclude Bell from questioning Strickland about the program. It ruled that Bell *could* cross-examine as to payments and other support provided by the government, Tr. 1340, imposing one restriction and one condition. The restriction was to prohibit questions about the protection aspect of the program and Strickland's "generalized fear of the other defendants, as they contrast to Bell." *Id.* This limit, based on the very real danger of prejudice to the other defendants, was well within the court's discretion.

■ The court's condition was that if the subject were opened, either the government or other defendants could elicit from Strickland the name of the program—including the word "protection." The court explained that completely unexplained admissions by Strickland that he was receiving money and other support from the government would create the damaging inference that the prosecution was paying Strickland to testify. Tr. 1344–46. Bell admits in his brief that his counsel made the tactical decision to forego *all* cross-examination on the Witness Protection Program in order to avoid opening the door for the government to bring out the name of the program on re-direct examination, with its connotation that Strickland feared violent retribution from all the defendants, including Bell. Brief for Bell at 31–32. Forcing the defendant to this kind of tactical decision hardly amounts to a total prohibition of inquiry into Strickland's bias. Moreover, Bell's counsel was given the opportunity to—and did—question Strickland at great length as to several other important aspects of the plea bargain with the government. Tr. 1434–69. In sum, the trial court's restrictions on Bell's cross-examination of Strickland regarding the Witness Protection Program constitute neither a violation of the Confrontation Clause nor an abuse of discretion.

### C. *Strickland's Payment of Attorneys' Fees for Nicholls*

■ Black, joined by Burns, claims that the trial court erred by refusing to allow re-cross examination of Strickland concerning Black's payment of attorneys' fees to defend one Richard Nicholls, the brother of a co-conspirator, against drug charges. During cross-examination of Strickland by Burns' counsel, Strickland revealed that Black paid a law firm $3800 to represent Nicholls in a pending criminal case. Tr. 672–73. Following re-direct examination of Strickland by the government, the trial court refused to allow Black's trial counsel to question him regarding the payment, stating that the matter could have been brought out by defendants' counsel on cross-examination. Tr. 1663–65.

The trial court's explanation for the limit is plainly correct. It was during cross by Strickland's *first* cross-examiner (Burns' lawyer) that Strickland made the statement now claimed to be so important. But neither Burns' nor Black's lawyer sought to dig deeper into the area. In neither case

Strickland's motives in testifying for the government, Tr. 1547–50.

was there any intimation from the court that the subject was off limits. As defendants' counsel had ample opportunity to delve into the payment on cross-examination, the trial court was entirely within its discretion in refusing to allow re-cross on the subject.[7] *See* FED.R.EVID. 611.

### D. *Miscellaneous Restrictions on Cross-Examination*

■ Black raises two other issues regarding the court's restrictions on cross-examination that do not merit extended discussion. First, Black claims that the defense was precluded from examining Strickland regarding an alleged agreement with some co-conspirators to "frame" the defendants. Contrary to Black's claim, however, the court never made such a ruling. Rather, the court prohibited defense counsel from questioning Strickland as to why certain alleged co-conspirators, including Sonny Croughn, had not been indicted. Tr. 1300, 1306, 1309, 1311, 1312, 1317–19. The limit was natural enough, given that Strickland had neither authority to ask the grand jury to indict co-conspirators nor personal knowledge of the reasons for the prosecutor's actions. This was not, therefore, an abuse of discretion.

■ Second, Black contends that the trial court forbade cross-examination of Kohn as to whether Strickland had counseled him to lie about the conspiracy. Again, Black mischaracterizes the court's ruling. The government conceded to the trial court that the defense is "entitled to show that Mr. Strickland tried to interfere with the grand jury process by counseling Mr. Kohn." Tr. 3337. *See also* Tr. 3338 (government has "no objection to [the defense] asking Mr. Kohn about the counseling he received from Mr. Strickland"). The court thus did not restrict the defense from inquiring into an alleged plan between Kohn and Strickland to lie to the grand jury. Tr. 3340. The court merely ruled that the defense could not examine Kohn regarding Strickland's invocation of the

Fifth Amendment before a grand jury. Tr. 3339–41. This was entirely proper.

### V. EVIDENTIARY RULINGS

### A. *Admission of Cocaine*

Defendants Black and Burns assert that under *United States v. Palumbo*, 639 F.2d 123 (3d Cir.), *cert. denied*, 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981), and *United States v. Falley*, 489 F.2d 33 (2d Cir.1973), the admission into evidence of one gram of cocaine was error because the relevance of the cocaine was outweighed by its prejudicial impact upon the jury. In *Falley*, the trial judge allowed the government to introduce a suitcase containing a dramatic quantity of hashish a witness had attempted to smuggle into the country, even though the hashish had nothing to do with the smuggling conspiracy charged in the indictment—the hashish was put in solely to prove the witness was a *bona fide* smuggler. On such facts, the Second Circuit held the admission of the evidence impermissibly prejudicial. Similarly, in *Palumbo*, there was "*no* evidentiary connection made between the drug possessed by the co-conspirator and the defendant in the conspiracy in issue." 639 F.2d at 127. In this case, however, the cocaine, although it traveled a somewhat picaresque route before coming into the government's possession, was adequately linked to the conspiracy charged in the indictment.

■ Strickland testified he had ordered a quantity of cocaine from Burns, who sent it to the Washington area via a courier. After receiving the cocaine, Strickland and Baker distributed some of the drug to Williams, a local dealer. Shortly thereafter, Williams was arrested, searched pursuant to the arrest, and relieved of the cocaine. It was this cocaine that was introduced at trial. The drug was plainly relevant to demonstrating the conspiracy's purpose, and it was not an abuse of discretion to admit it.

---

7. In any event, Black was later given the opportunity to explain his retainer of a criminal defense lawyer for Nicholls, Tr. 4903–05, and to cross-examine the lawyer about his arrangement with Black, Tr. 4039–42.

## B. *Limitations on Collateral Impeachment*

During the trial, the testimony of two prospective witnesses for Burns and a tape recording allegedly of a statement by Barbara Jo Rubin were excluded. Barbara Jo Rubin, a government witness who was also Burns' second cousin and former girlfriend, testified that Burns had purchased a house in Miami, paying cash for it, that Burns told her the house would be deeded to her as partial payment for her role in drug transactions, and that at the settlement for the house she saw a deed putting the property in her name. Rubin also testified that Burns, together with three of his friends who were police officers, evicted her from the house in the midst of a nighttime altercation. Burns wished to call one of the three police officers, Sergeant Matthews, who it is asserted would have testified that the details of the altercation were not as Rubin had claimed, and moreover, that while being evicted Rubin said she did not own the house. The second witness, Burns' former wife, would have authenticated a tape recording Burns sought to have admitted into evidence. The proffered testimony of the former Mrs. Burns was that a woman, whose voice she recognized as Rubin's, left a message on her answering machine one afternoon while she was not at home, admitting the house belonged to Burns. The trial judge refused to allow either witness to testify, largely on the grounds that their testimony concerned only collateral issues. Burns contends this ruling was erroneous.

The source of the trial court's power to exclude such evidence is not entirely clear—the government in its brief relies on FED.R.EVID. 608(b), which states that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence." But by its terms this rule does not apply here,

because Matthews would not necessarily have testified about Rubin's conduct, but rather about the details of Rubin's eviction. For example, Rubin said cocaine was in plain view during the eviction, while Matthews would presumably have contradicted her on this point, thereby drawing Rubin's credibility into question, but without referring to her conduct. So although Burns sought Matthews' testimony in order to impeach Rubin's credibility, the proposed impeachment would not consist of showing specific instances of Rubin's conduct (*i.e.*, fraudulent or dishonest behavior) indicative of untruthfulness. We think it only this latter type of evidence that Rule 608(b) addresses. *See United States v. Opager,* 589 F.2d 799 (5th Cir.1979) (Rule 608(b) applies solely to evidence showing a witness' general character for truthfulness).

█ The exclusion of Sergeant Matthews' testimony is an application not of Rule 608(b), but of what is referred to as the "specific contradiction" rule, which states that "a witness may not be impeached by extrinsic evidence (contradiction by another witness or evidence) on a collateral issue." *United States v. Pugh,* 436 F.2d 222, 225 (D.C.Cir.1970). This rule serves "to avoid confusion of the issues and undue extension of the trial. This is essentially a matter of administrative policy and concentration of attention." *Ewing v. United States,* 135 F.2d 633, 643 (D.C. Cir.1942).[8] In an old English case the rule is justified as a consequence of our not having a thousand year life span. *See* 3A WIGMORE, EVIDENCE SEC. 1002 (Chadbourn rev. 1970) (citing *Attorney–General v. Hitchcock,* 1 Exch. 91, 104 (1847)). The "specific contradiction" rule then is a particular instance of the trial court's general power under Fed.R.Evid. 403 to exclude evidence "if its probative value is substantially outweighed ... by considerations of undue delay, [or] waste of time." *See* 3 WEINSTEIN, EVIDENCE ¶ 607[05] at 83.

---

8. The rule may also serve to avoid unfair surprise. For example, where a defendant in a criminal case takes the stand and on cross-examination denies charges of unrelated misconduct, the government may not attempt to impeach his credibility with extrinsic evidence of

such misconduct. *See Lee v. United States,* 368 F.2d 834, 836–37 (D.C.Cir.1966); *see also Tinker v. United States,* 417 F.2d 542, 545 n. 15 (D.C. Cir.), *cert. denied,* 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969); *Dixon v. United States,* 303 F.2d 226 (D.C.Cir.1962).

█ It was undoubtedly within the trial judge's discretion to exclude that part of Matthews' testimony which simply contradicted details of Rubin's eviction, since the eviction was purely collateral to the case and Burns' sole reason for presenting evidence concerning it was to impeach Rubin's credibility.

The exclusion of Sergeant Matthews' testimony regarding Rubin's statement that she did not own the house is somewhat more troubling. The government invokes the specific contradiction rule, arguing that because Rubin denied on cross-examination making the statement, the exclusion was proper, for Matthews' testimony was an impermissible attempt to use extrinsic evidence to impeach a witness on a collateral matter. The difficult issue is whether Rubin's denial can properly be characterized as collateral. A commonly used test of collaterality asks: "Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?" 3A WIGMORE, EVIDENCE SEC. 1003 (CHADBOURN REV.1970); *see Tinker*, 417 F.2d at 545 n. 16. The government suggests that under this test the ownership of the house is collateral. This depends, however, despite the seeming definiteness of the test, upon what stage of the trial one takes as his vantage point. Certainly, had the government not introduced any evidence regarding the ownership of the house, Burns could not then himself have introduced evidence on this question, as it bears no relevance to any elements of the crimes charged or to any affirmative defenses to those crimes. To that extent, Burns had no reason "independent[ ] of the contradiction" to offer the evidence.

█ Nevertheless, once Rubin testified she had participated in drug dealing with Burns and had been paid for her services with the house, the question of ownership assumed a relevance independent of Rubin's credibility—the house was now evidence of Burns' participation in a drug conspiracy, for the government claimed it was a form of payment used by Burns to buy services needed to further the aims of the conspiracy. If Burns could show the house had never been transferred to Rubin as a form of payment, he would have negated a part of the government's case against him. We do not believe, therefore, that the issue of who owned the house can properly be called collateral. *See United States v. Dimatteo*, 716 F.2d 1361, 1366–67 (11th Cir.1983) (evidence may be admitted to prove or disprove material facts in a case, even though a previous witness has testified to the contrary), *cert. denied*, 474 U.S. 860, 106 S.Ct. 172, 88 L.Ed.2d 143 (1985); *Opager*, 589 F.2d at 803 (same).

█ The trial judge, however, did not rely on the erroneous proposition that whether Rubin had been paid with a house was collateral. He said "[t]he issue ... as to the purposes for which the house was bought ... is not collateral." Tr. 4277. Instead, Sergeant Matthews' testimony was excluded because it was not sufficiently *relevant* to the question of ownership— it mainly concerned a dispute on a collateral detail. All the testimony, including the proffer of Sergeant Matthews' testimony, indicated that the night Rubin left Burns' home was very chaotic. Rubin denied having said, while being forcibly evicted, that the house belonged to Burns. Sergeant Matthews would have testified to the contrary. This dispute—whether Rubin made the statement—is certainly collateral to the case, and, furthermore, is not highly probative, given the riotous circumstances in which it was made, of the underlying factual issue of who owned the house.[9] Therefore, keeping in mind the broad discretion entrusted to the trial judge by FED. R.EVID. 403 to exclude relevant evidence on the grounds of confusion, considerations of undue delay or waste of time, we cannot say the exclusion of Sergeant Matthews' testimony was an abuse of discretion. *See United States v. DeLoach*, 654 F.2d 763,

---

9. That this was the grounds for the trial judge's decision to exclude is indicated by his statement that "I query whether or not it is collateral as to what she yelled at Sergeant Murphy [sic] when she got bounced out of this house, after having a fight." Tr. 4277–78.

770 (D.C.Cir.1980), *cert. denied,* 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 209 (1981).

■ It was also within the trial judge's discretion to refuse to admit the tape recording of the message allegedly left by Rubin on the answering machine of Burns' former wife. The original tape had been erased, and Mrs. Burns had made a copy of it prior to erasing the original, although at trial she admitted to not understanding very much about tape recording. Nor did Mrs. Burns play the tape for anyone, including her lawyer, for over five years, even though the message indicated Burns was the real owner of the house, and so directly conflicted with Burns' sworn testimony in a divorce proceeding that he did not own the house—a divorce proceeding in which Mrs. Burns had an obvious interest. Furthermore, the tape had not been in Mrs. Burns' continuous custody for the five years; she testified she had recently given it to a lawyer who was representing her in a civil forfeiture proceeding concerning the house. Under *United States v. Sandoval,* 709 F.2d 1553, 1554 (D.C.Cir.1983), "[t]he admission of tape recordings into evidence is committed to the sound discretion of the district court." The trial judge did not abuse his discretion by refusing to admit this evidence on grounds he was not confident of its reliability.

## C. *Prior Consistent Statements*

Appellant Burns contends that a prior consistent statement made by Strickland was improperly admitted for the purpose of rebutting a charge of "recent fabrication" implicitly raised against him in cross-examination. *See* FED.R.EVID. 801(d)(1)(B). At the time this evidence was admitted, no objection was made, so we may consider Burns' contention only if admission was a "plain error[ ] affecting substantial rights." FED.R.EVID. 103(d); FED.R.CRIM.P. 52(b).

Strickland testified that, during the course of the conspiracy, he had transferred $250,000 to Black. On direct examination, Strickland characterized this transfer as a payment for Black's introducing him to Burns. On cross-examination, Burns' lawyer read Strickland testimony Strick-

land had given in another proceeding, in which Strickland characterized the payment as an investment in the Dunbar Corporation and its holdings in Atlantic City. Tr. 1026–29. On redirect examination, the prosecutor read additional testimony given by Strickland at the same previous trial, in which Strickland was asked whether he got anything besides stock in Dunbar Corporation, and Strickland answered "Well, I got the introduction to Robert Burns." Tr. 1625.

■ Under FED.R.EVID. 801(d)(1)(B), a prior consistent statement is admissible if the declarant testifies at trial, is subject to cross-examination concerning the statement, and the statement is "consistent with declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication." *United States v. Sampol,* 636 F.2d 621, 671 (D.C.Cir.1980); *see also United States v. Coleman,* 631 F.2d 908, 913–14 (D.C.Cir. 1980). Strickland's prior consistent statements satisfy these requirements. Furthermore, on redirect Strickland was merely asked to confirm the remainder of the prior statements already introduced on cross-examination, in order to place those statements in context. The opposing party may not pick and choose among prior statements to create an appearance of conflict and then object when this appearance is rebutted by means of a fuller version of the same prior statements. *See United States v. Andrade,* 788 F.2d 521, 532–33 (8th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986). It was not error, much less plain error, for the trial judge to admit these statements.

## D. *Co-conspirators' Statements*

■ Under FED.R.EVID. 801(d)(2)(E), "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. Appellants Black and Burns assert the admission of several hearsay statements was error, because the statements were not made "during the course and in furtherance of the conspiracy." The "in furtherance of" requirement is a limitation on what state-

ments by co-conspirators may be admitted; mere narratives of past successes and failures, for example, are not admissible. *United States v. Haldeman,* 559 F.2d 31, 110 (D.C.Cir.1976) (en banc), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Nor are a "conspirator's casual comments to people outside or inside the conspiracy" admissible under this rule. *United States v. Snider,* 720 F.2d 985, 992 (8th Cir.1983), *cert. denied,* 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984). If the statement, however, can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy, then the statement is in furtherance of the conspiracy and may be admitted. *See id.; United States v. Patton,* 594 F.2d 444, 447 (5th Cir.1979).

 Ribera testified he had discussions with Strickland during which Strickland said that investing in the casino Black was building in Atlantic City "would be a good way for us to invest our money, and even to wash or clean up our money, which was this illegal drug money." Tr. 1825. Black's objection to this testimony is twofold. First, Black argues that since Ribera states he did not invest in Black's casino venture, Strickland's remark was merely a part of a casual conversation and not in furtherance of the conspiracy. But the statement is essentially an invitation to participate in a further stage of the conspiracy—that the invitation was declined is irrelevant to whether it was intended to further the conspiracy. Secondly, Black argues that laundering drug proceeds is unrelated to the conspiracy to distribute cocaine, and thus the statements were not in furtherance of the conspiracy charged in the indictment. However, as was shown *supra* at 1396–97, this argument ignores the nature of the conspiracy charged,

which included the laundering of funds. In any event, there is no requirement that the actions invited by the hearsay statements be charged in the indictment or be illegal—any act which furthers the conspiracy (certainly easy transfer of the large sums of money generated by the sale of cocaine would further a conspiracy to distribute cocaine) may be admitted under this rule.

 Rubin testified that while she was living with Burns, he would act as a middleman for numerous cocaine sales, operating out of his home. Rubin was often home while these deals took place, but in another room. Her testimony concerning many of the details of these transactions would therefore be hearsay but for 801(d)(2)(E)—after the deal was done and the participants had left, Burns would tell her what happened, including details about his profits. Appellants characterize these conversations as mere narrations of past events—not necessary to or in furtherance of the ongoing conspiracy. Appellants' argument would be stronger if Burns had recapitulated the details of these transactions months or years after they had occurred, for then it would be more difficult to see what purpose such narration could have. But where the recounting took place soon after the events at issue, and where Rubin was a participant in the overall conspiracy, acting as a courier and helping to count the money generated by the deals, Burns' reports helped to keep Rubin current on the status of the business. In particular, it is quite plausible that the statements regarding profits could have served as motivation for her continued participation.[10]

 Later on in the trial, Kohn, who acted as bookkeeper for the land project in Texas, testified about statements by Strickland and Maddux concerning the fictitious

---

10. Burns makes a similar objection to Ribera's testimony regarding details of drug transactions involving Burns, Strickland, and Kupits. Ribera testified as to how much Burns was charging for his services as a middleman, as well as other details. Ribera, like Rubin, was often not in the room while the sale was made, so much of his testimony was based on what would be

hearsay, but for the rule. However, also like Rubin, Ribera had an active part in the conspiracy, and, in fact, in the very deals related to him by Strickland or Kupits. For this reason, the discussions among Ribera, Strickland and Kupits were clearly in the course of and in furtherance of the conspiracy.

nature of two $60,000 loans Black had made to the Texas land development corporation. Evidence showed these loans had been "washes": Black made out two $60,000 checks only after receiving two payments of $60,000 in cash, thus providing a seemingly legitimate source for the funds used by the land development corporation. It was some time after these phony loans were made that Kohn was informed about them, and for this reason appellant Black objects to the admission of Strickland's statements to Kohn, contending they were mere narratives of past events. As bookkeeper for the organization, however, Kohn needed to understand the nature of the debts nominally listed on the books of the Texas land corporation. This became particularly important when Black began to demand some form of repayment, so as to convince the IRS that the loans were legitimate. Thus, although Strickland's statements to Kohn about the loans did not "set in motion transactions that were an integral part of the ... scheme," *United States v. Eubanks*, 591 F.2d 513, 520 (9th Cir.1979), they did provide important background information to a key player, thereby helping him to carry out his duties. The statements were therefore properly admitted. *See Snider*, 720 F.2d at 993 (statements were in furtherance of a conspiracy when they aided a co-conspirator's "informed participation"); *Haldeman*, 559 F.2d at 110–11 (statements necessary to facilitate coordination among co-conspirators in covering up conspiracy are in furtherance of conspiracy).

## VI. THE REFERENCE TO BLACK'S BEING NAMED IN ANOTHER INDICTMENT

In Bell's counsel's cross-examination of Strickland as to his plea bargain with the government, he showed Strickland a copy of the indictment in another case, and Strickland inadvertently referred to Black's inclusion among the named defendants:

Q. And [the government is] also going to drop count 25, another travel act count; is that correct?

A. Count 25?

Q. Right.

A. Count 25 is Mr. Black.

Q. You are not in that count?

A. I am sorry. I don't see it here, no. It is just Mr. Black.

\* \* \* \* \* \*

Q. How about 28?

A. Mr. Black and myself.

Tr. 1444–45. Black's counsel immediately moved for a mistrial. The trial court denied the motion, but offered to instruct the jury to disregard the testimony. Black's trial counsel declined the offer. Tr. 1454–57.

The trial court did not err by denying Black's motion for a mistrial. The decision whether to grant a mistrial generally rests within the sound discretion of the trial court, and the single most important factor in making that determination is the extent to which the defendant has been prejudiced. *See United States v. Bailey*, 675 F.2d 1292, 1297 (D.C.Cir.), *cert. denied*, 459 U.S. 853, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982). Here the risk of prejudice seems slight. Contrary to Black's characterization of the testimony as "repeated references to Mr. Black's involvement in a concurrent criminal case," Brief for Black at 52, Strickland's mention of Black's indictments was inadvertent and brief, and took place on a single occasion five weeks before the start of the jury's deliberations. The government never mentioned the reference in later questions or argument. Thus we cannot say that the reference had such a prejudicial effect on the jury's decision that it was an abuse of discretion to deny the motion.

In two past decisions we have upheld denials of a mistrial after far more hazardous blurtings. In *Hardy v. United States*, 343 F.2d 233, 234 (D.C.Cir.1964), *cert. denied*, 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed. 2d 276 (1965), a witness was asked if he had ever previously seen the defendant, and replied in the affirmative, explaining that "we had did [*sic*] time in the penitentiary together." Similarly, in *McIntosh v. United States*, 309 F.2d 222 (D.C.Cir.1962), *cert. denied*, 373 U.S. 944, 83 S.Ct. 1557, 10 L.Ed.2d 700 (1963), a government witness

referred to a person as the defendant's "parole officer." We held that the "vague and indirect suggestion of some previous conviction" did not compel a mistrial. *Id.* In both cases the jury was—in effect—informed of a defendant's past *conviction*, whereas Strickland mentioned only an *indictment.*

There are, to be sure, cases from other circuits finding undue prejudice in references to convictions in particular circumstances. *See United States v. Ailstock,* 546 F.2d 1285, 1291 (6th Cir.1976) (reference to defendant's two prior terms in the penitentiary constituted prejudicial error); *United States v. Poston,* 430 F.2d 706, 709 (6th Cir.1970) (reference to defendant being on probation was prejudicial); *Tallo v. United States,* 344 F.2d 467, 468 (1st Cir.1965) (reference to defendant's past jail term "could only be prejudicial"). Even if these cases meant that reference to conviction automatically required a mistrial, they would be inconsistent with *Hardy* and *McIntosh,* which control in this circuit. And the same indictment/conviction factor, by which the correctness of the trial judge's ruling follows *a fortiori* from *Hardy* and *McIntosh,* readily distinguishes them. The court properly denied the motion.

## VII. DISCLOSURE OF WITNESS STATEMENTS

### A. *Jencks Act*

Appellants Burns and Tarantino allege that notes and other material regarding the testimony of several government witnesses were improperly withheld from the defense. Tarantino was especially concerned with statements by government witnesses (so-called Jencks Act material) relating to conversations these witnesses had with Strickland or relating to details of the particular drug transactions about which Strickland testified. Tarantino argues that the government should have been required to turn these statements over to the defense prior to Strickland's cross-examina-

tion because access to these statements would have enhanced defense counsels' ability to cross-examine Strickland—the key government witness.

▉ Federal Rule of Criminal Procedure 16(a)(2) prohibits discovery of statements by government witnesses or prospective government witnesses except as provided in the Jencks Act, 18 U.S.C. § 3500 (1982). The Jencks Act directs that in a criminal prosecution, statements made by government witnesses or prospective government witnesses are not open to discovery or inspection by the defense until said witnesses have testified on direct examination in the trial of the case. *See United States v. Campagnuolo,* 592 F.2d 852, 858 (5th Cir.1979); *Haldeman,* 559 F.2d at 77 n. 111. In balancing a criminal defendant's need for such statements against legitimate state interests, Congress provided for discovery of statements only *after* the witness has testified, out of concern for witness intimidation, subornation of perjury, and other threats to the integrity of the trial process. *United States v. Roberts,* 811 F.2d 257 (4th Cir.1987) (en banc); *United States v. Mills,* 641 F.2d 785, 790 (9th Cir.), *cert. denied,* 454 U.S. 902, 102 S.Ct. 409, 70 L.Ed.2d 221 (1981); *United States v. Murphy,* 569 F.2d 771, 773 (3d Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978); *United States v. Percevault,* 490 F.2d 126, 131 (2d Cir.1974). This congressional determination is not to be disregarded by the courts. "The Act supplies the only avenue to the materials it encompasses, and 'statements of a government witness made to an agent of the Government which cannot be produced under the terms of 18 U.S.C. § 3500 ... cannot be produced at all.'" *Haldeman,* 559 F.2d at 77 n. 111 (quoting *Palermo v. United States,* 360 U.S. 343, 351, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287 (1959)). So, under the Jencks Act, defendants had no right to the statements given by other witnesses prior to Strickland's cross-examination.[11] Only after those witnesses them-

---

11. Of course, under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government has additional obligations deriving from the Fifth Amendment to disclose exculpatory material, and the limitations on discovery contained in the Jencks Act do not lessen those

selves testified does the Jencks Act give the defendants access to their statements.[12]

## B. *Sixth Amendment*

■ In addition to his arguments based on the Jencks Act, appellant Tarantino contends that the failure of the government to turn over certain material constituted an improper denial of cross-examination, thus violating the Confrontation Clause of the Sixth Amendment. Tarantino argues, in particular, that notes made by government agents while interviewing Kohn, which were later used to refresh Kohn's recollection during his grand jury testimony and which the trial court therefore found had been adopted by Kohn for purposes of the Jencks Act, should have been turned over to the defense prior to Strickland's cross-examination. Tarantino asserts these notes would have aided the cross-examination of Strickland, because Kohn described some of the same transactions described by Strickland, but Kohn's versions were different in various details.[13]

Appellant's attempt to use the Sixth Amendment as a constitutional rule of discovery, over and above the discovery provided by the Federal Rules of Criminal Procedure and the Jencks Act, is barred by the plurality opinion in *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). In *Ritchie*, the defendant, who was charged with sexual offenses against his minor daughter, argued that his right to cross-examine the witness against him (his daughter) was impaired when a state protective service agency responsible for investigating cases of child abuse refused to turn over its records to him. Unlike this case, the records sought in *Ritchie* were alleged to contain statements made by the witness herself to agency counselors. Nevertheless, the plurality refused to hold the failure to produce these records violated defendant's right to cross-examine. The Court said that

> the right of confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination.... The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses.

*Ritchie*, 107 S.Ct. at 999 (citations and footnote omitted). Similarly, in this case, the government's refusal to produce statements made by *other* potential witnesses prior to Strickland's cross-examination did not breach appellant's right to cross-exam-

obligations. *See United States v. Bernard,* 607 F.2d 1257, 1263 (9th Cir.1979) (*Brady* is an independent foundation to preserve evidence); *Murphy,* 569 F.2d at 774; *Haldeman,* 559 F.2d at 77–78 and n. 112 (*Brady* duty may extend to material also covered by Jencks Act); *United States v. Kaplan,* 554 F.2d 577, 580 (3d Cir.1977) (*Brady* and Jencks Act may both cover same material); *United States v. Harrison,* 524 F.2d 421, 427 (D.C.Cir.1975) (*Brady* broadened beyond the Jencks Act the possible grounds for production of material to defense). *See* discussion *infra* at 1416–17.

**12.** We note, however, that trial judges, with the consent of the government, routinely fashion discovery procedures that entail production of Jencks material before trial or prior to direct examination, in order to facilitate the defense's preparation for cross-examination. Such a sensible procedure was used in this trial, and the defense received the bulk of the Jencks material 48 hours prior to direct testimony by government witnesses. *See United States v. Algie,* 667 F.2d 569, 571–72 (6th Cir.1982); *Campagnuolo,* 592 F.2d at 858 n. 3; *Murphy,* 569 F.2d at 773 n. 5; *Percevault,* 490 F.2d at 132.

**13.** For example, on direct examination, Strickland testified that he and Kohn had driven up to New Jersey from Washington to deliver cocaine and had met with Tarantino at a rest stop on the New Jersey Turnpike. Strickland testified that "[w]e [Strickland and Kohn] found the rest stop, and Mr. Tarantino was there in his car. We gave him the kilo." Tr. 478. On cross-examination, Kohn testified he and Strickland drove to New Jersey with a suitcase of cocaine in the trunk and met with Tarantino at a rest stop, but that Strickland and Tarantino talked separately from him and that he did not see any transfer of cocaine. Tr. 3542–54. Rather than contradiction, Kohn's version could most accurately be described as a failure to corroborate an important detail of Strickland's testimony, although in almost all other particulars, the two versions matched very closely.

ine Strickland—the refusal to turn over potentially useful or even exculpatory material is not equivalent to a restriction on cross-examination under *Ritchie. See also United States v. Balistrieri,* 779 F.2d 1191, 1221 (7th Cir.1985), *cert. denied,* 475 U.S. 1094, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986).

C. *Brady*

■ Tarantino also argues that the failure to disclose the statements by witnesses that contradicted Strickland's version of events violated the due process clause of the Fifth Amendment as interpreted in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).[14] Under *Brady* the government may not suppress evidence favorable to the accused when it is material to either guilt or punishment, and under *Giglio* and *Bagley* such evidence includes impeachment material. One element of a successful *Brady* claim is that the government did, in fact, suppress the evidence. *United States v. Driver,* 798 F.2d 248, 250 (7th Cir.1986); *United States v. Preston,* 608 F.2d 626, 637 (5th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed. 2d 794 (1980); *United States v. Bernard,* 607 F.2d 1257, 1263 (9th Cir.1979). No suppression occurred here—Kohn's statements to the government agent were undisputedly delivered to the defense in accordance with the requirements of the Jencks Act. Tarantino, however, claims the production was too late to be useful in Strickland's cross-examination. This argument strikes us as an attempt to convert *Brady* into a broad rule of discovery in criminal cases. Appellants' argument necessarily suggests that all relevant material held by the government must be produced *prior* to trial, for relevant material will always be at least marginally useful at every stage of the trial. As a matter of policy such broad discovery might or might not be wise, but certainly it is not required by present law. *See United States v. Agurs,* 427 U.S. 97,

108–09, 96 S.Ct. 2392, 2398–2400, 49 L.Ed. 2d 342 (1976). The Supreme Court has stated that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one; ... 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded.'" *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977) (quoting *Wardius v. Oregon,* 412 U.S. 470, 474, 93 S.Ct. 2208, 2212, 37 L.Ed.2d 82 (1973)); *see United States v. Kendall,* 766 F.2d 1426, 1440–41 (10th Cir. 1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986); *United States v. Pollack,* 534 F.2d 964, 975 (D.C.Cir.), *cert. denied,* 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976).

Once defendants obtained Kohn's statements, they were perfectly able to impeach his trial testimony if inconsistent. And during Kohn's cross-examination or during final argument, defendant's counsel could call the jury's attention to any inconsistencies between Kohn's version of the events (whether the account presented at trial or the one given to the government agents, if the two were at odds) and Strickland's rendition. Tarantino argues, nevertheless, that because the material was unavailable for Strickland's cross-examination, the force of the discrepancies was likely to have been lost on the jury. This argument is unavailing for two reasons. First, witnesses are not impeached by prior inconsistent statements of *other* witnesses, but by their *own* prior inconsistent statements. *See* FED.R.EVID. 613, 801. And even if it had been permissible to confront Strickland with a statement by Kohn that the details of a particular transaction were not as Strickland had said, the effectiveness of this is not self-evident, as Strickland could not confirm or deny that Kohn had made the statement or explain Kohn's statement.

Second, *Brady* provides the sole theory on which Kohn's statements were discoverable prior to Kohn's direct examination. But under *Brady,* "the prosecutor is not required to deliver his entire file to defense

---

**14.** Appellant Burns joined in this argument.

counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Bagley,* 473 U.S. at 675, 105 S.Ct. at 3380 (footnotes omitted); *see Pollack,* 534 F.2d at 975. Thus, *Brady* directs only that "material" information be disclosed, and in *Bagley* the Supreme Court held information is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." 473 U.S. at 682, 105 S.Ct. at 3383; *see United States v. Kelly,* 790 F.2d 130, 135–36 and n. 3 (D.C.Cir.1986).

Since the evidence at issue here *was* disclosed, Tarantino must establish that had the statements been disclosed earlier, there is a probability sufficient to undermine our confidence in the actual outcome that the jury would have acquitted. Because we doubt whether earlier discovery of the statements would have appreciably increased the effectiveness of Strickland's cross-examination, and because the defense was not foreclosed from arguing any inconsistencies to the jury at a later point in the trial, we think that nothing approaching a *Brady* violation occurred here. *See United States v. Browne,* 829 F.2d 760, 765–66 (9th Cir.1987) (*Brady* not violated where impeachment material was disclosed after several witnesses had testified, but in time to be used to impeach key witnesses); *United States v. Twomey,* 806 F.2d 1136, 1141 (1st Cir.1986); *United States v. Brimberry,* 803 F.2d 908, 911–915 (7th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1977, 95 L.Ed.2d 817 (1987); *United States v. Peters,* 732 F.2d 1004, 1008–10 (1st Cir. 1984); *United States v. Kaplan,* 554 F.2d 577, 580 (3d Cir.1977); *United States v. Harris,* 458 F.2d 670, 675–77 (5th Cir.), *cert. denied,* 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972) (*Brady* does not override Jencks Act where one witness' statement is inconsistent with another's and where defense could bring out discrepancy at trial).

### D. *Statements by Co-conspirators*

Finally, appellant Tarantino argues that the trial court erred in not ordering the government to turn over any Jencks material relating to Nancy Strickland. During the trial, Tarantino's counsel requested discovery of Nancy Strickland's Jencks material so he could use it to aid his decision whether to ask for Lonnie Strickland's recall for re-cross examination or to call Nancy Strickland as a witness for the defense. Tr. 4119. This motion was made after it became apparent that the government was not going to call Nancy Strickland as a government witness. However, just as the Jencks Act does not provide for the discovery of statements by government witnesses prior to their actual testimony, it also does not require production of statements by potential witnesses who in fact do not ultimately testify. *United States v. Mills,* 810 F.2d 907, 910 (9th Cir.) (Judge, now Justice, Kennedy), *cert. denied,* — U.S. —, 108 S.Ct. 107, 98 L.Ed.2d 67 (1987); *United States v. Cadet,* 727 F.2d 1453, 1469 (9th Cir.1984) (abuse of discretion to order production of statements of witnesses the government did not intend to call); *United States v. Disston,* 612 F.2d 1035, 1038 (7th Cir.1980).

Tarantino asserts, nevertheless, that he was entitled to discovery of Nancy Strickland's statements because she was a co-conspirator. Nancy Strickland, an unindicted co-conspirator, was listed as a prospective witness and before trial had made statements to government agents regarding the conspiracy. She was not called by the government to testify, and while it is true that the government did not hinder the defense from interviewing her, the defendants felt, perhaps reasonably, that any attempt to do so would have proved futile. Moreover, although Nancy Strickland was available as a witness for the defense, the defense was understandably reluctant to call her without either a prior interview or knowledge of statements she may have made to the government. Nancy's statements were presented to the district court for review *in camera;* the court concluded the statements did not contain *Brady* material and refused to order disclosure.

Tarantino's argument in favor of discovery requires a close reading of FED. R.EVID. 801(d)(2)(E) in conjunction with FED.R.CRIM.P. 16(a)(1)(A). Under 801(d)(2)(E), a co-conspirator's statement is attributed on an agency rationale to each of the co-conspirators, and so it is classified as non-hearsay and may be admitted against each co-conspirator as if it were *his own* statement. And under 16(a)(1)(A), a defendant is entitled to pre-trial discovery of any of his own statements in the government's possession. Thus, because the co-conspirator's statements may be treated as the defendant's own for purposes of hearsay analysis, Tarantino argues they should be discoverable in the same manner as the defendant's own statements. Once it was apparent that Nancy Strickland would not testify for the government and consequently her statements would not be discoverable in accordance with the Jencks Act, Tarantino contends the trial court should have ordered disclosure.

Even though the Jencks Act explicitly provides that statements of witnesses or prospective witnesses, including co-conspirators, are not discoverable until after the witness testifies, some courts have ordered disclosure of co-conspirator statements where the prosecution does not propose to put the co-conspirator on the stand. *See United States v. Konefal,* 566 F.Supp. 698, 705–07 (N.D.N.Y.1983) (citing cases in accord); 2 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 253 at 50 (2d ed. 1982) (citing cases).

We believe, however, that we are without authority to order such discovery. Nothing in the Federal Rules of Evidence or in the Jencks Act requires such disclosure— we think it clear that as used in Fed.R. Crim.P. 16(a)(1)(A) the phrase "statements made by the defendant" does not include statements made by co-conspirators of the defendant, even if those statements can be attributed to the defendant for purposes of the rule against hearsay. Once appellant's imaginative reading of 16(a)(1)(A) is rejected, no other authority is suggested for this type of discovery order. Under our law, the adversary system is "the primary

means by which truth is uncovered." *Bagley,* 473 U.S. at 675, 105 S.Ct. at 3380. We decline to extend the defendant's right to discovery beyond that required by statute or the Constitution. We note this result is in agreement with every other circuit that has examined the question. *See United States v. Orr,* 825 F.2d 1537 (11th Cir. 1987); *United States v. Roberts,* 811 F.2d 257 (4th Cir.1987) (en banc); *United States v. Percevault,* 490 F.2d 126 (2d Cir.1974); *see also* 8 J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 16.04[1] at 16–54, 55 (2d ed. Nov. 1986 Rev.).

## VIII. CONTINGENT PLEA ARRANGEMENTS

Strickland agreed to testify in exchange for a promise that the government would advise the sentencing judge of "the full nature, extent, and *value* of the cooperation provided." Tr. 79 (emphasis added). The plea agreement further provided that if Strickland made "any false statements or commit[ted] any perjury ... the United States will have the right to terminate this agreement and prosecute him for any and all offenses that can be brought." Tr. 81.

Bell argues that Strickland's testimony should have been stricken because it represented the fruits of a prohibited contingent plea arrangement. Strickland's incentive to lie was overwhelming, says Bell, because the government's sentence recommendation would be inversely related to the "value" of his testimony, i.e., how many people he was instrumental in convicting. Bell points to Strickland's cross-examination as demonstrating that Strickland understood the condition as a contingent plea arrangement, but Strickland testified that he understood "value" to mean "about what crimes that have been committed, and may be committed, am I giving information." Tr. 1464–65. Bell argues Strickland's testimony is inherently untrustworthy and must be stricken under the Fifth and Sixth Amendments. Brief for Bell at 46–50.

In *United States v. Waterman,* 732 F.2d 1527 (8th Cir.1984), on which Bell largely relies, the government promised its main witness that it would recommend a reduction in his sentence if and only if his testi-

mony led to further indictments. The court reversed the conviction, holding that the agreement between the government and the witness was "nothing more than an invitation to perjury having no place in our constitutional system." 732 F.2d at 1531. The panel's opinion in *Waterman* was subsequently vacated following an en banc vote that produced an equally divided court. *Id.* at 1533, *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985). It has no precedential value, even within the Eighth Circuit. *E.g., United States v. Spector,* 793 F.2d 932, 936 (8th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987).

In another case cited by Bell, *United States v. Cervantes–Pacheco,* 800 F.2d 452 (5th Cir.1986), a government informer was hired to gather information on a particular individual. The informer's pay was dependent on his effectiveness in gathering information and testifying against the targeted individual. The court held that use of the informer's testimony violated due process. The Fifth Circuit, sitting en banc, reversed the *Cervantes–Pacheco* panel opinion, and held instead that "an informant who is promised a contingent fee by the government is not disqualified from testifying.... [I]t is up to the jury to evaluate the credibility of the compensated witness." 826 F.2d 310, 315 (5th Cir.1987) (en banc), *cert. denied,* — U.S. —, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

The agreement between the government and Strickland was less akin to these contingent arrangements than to a typical plea bargain under which an accomplice agrees to testify in exchange for a promise of a reduced sentence. Courts "uniformly hold that such a witness may testify so long as the government's bargain with him is fully ventilated so that the jury can evaluate his credibility." *Cervantes–Pacheco,* 826 F.2d at 315 (citing *United States v. Dailey,* 759 F.2d 192, 198–200 (1st Cir.1985)); *see also Spector,* 793 F.2d at 937 & n. 3, and cases cited; *United States v. Rosenthal,* 793 F.2d 1214, 1240–41 (11th Cir.) (testimony permitted despite agreement in which government would inform sentencing judge of "value to the Government" of defend-ant's testimony and make a recommendation based upon a "subjective evaluation by the Government of the nature and scope" of cooperation), *modified in different part,* 801 F.2d 378 (11th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987).

 Although conditioning the sentencing recommendation on the "value" of the witness' testimony may in some cases create a greater incentive to lie, the likelihood of perjury is clearly not enough as to require a *per se* rule excluding such testimony. The "value" of Strickland's testimony was not necessarily tied to the success of the prosecutions, and Strickland did not so testify. Tr. 1464–65. *See Dailey,* 759 F.2d at 197 (upholding "value" agreement). Moreover, the sentencing recommendation was conditioned on truthful testimony, which surely must encourage veracity. *E.g., United States v. Moody,* 778 F.2d 1380, 1385 (9th Cir.1985) (requirement of truthful testimony "negates inference of inducement to testify falsely" (citing *Dailey,* 759 F.2d at 197)), *amended on other grounds,* 791 F.2d 707 (9th Cir.1986). Finally, the agreement itself was the subject of extensive cross-examination. "The established safeguards of the Anglo–American legal system leave the veracity of the witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Hoffa v. United States,* 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966). Under the circumstances of this case, admission of Strickland's testimony was permissible.

## IX. BURNS' DESIRE TO REPRESENT HIMSELF

Citing the Supreme Court's decision in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), Burns contends that the trial court violated his rights under the Sixth Amendment by "thrust[ing] counsel" upon him and refusing to allow him to represent himself at trial. In *Faretta,* the Supreme Court held that the Sixth Amendment right to the assistance of counsel includes the right to

"proceed without counsel when [the defendant] voluntarily and intelligently elects to do so." *Id.* at 807. Because the exercise of the right of self-representation involves a waiver of the right to assistance of counsel, *United States v. Weisz,* 718 F.2d 413, 425 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984), we have recently emphasized that "the right of self-representation is waived unless defendants articulately and unmistakably demand to proceed *pro se,*" *id.* at 426.

Our reading of the trial transcript demonstrates to us that Burns never made an unambiguous waiver of his right to assistance of counsel or, therefore, an unambiguous claim to represent himself. It is true that from time to time, in the first trial (which later ended in a mistrial due to Black's illness) and the second, and in status hearings, he expressed his desire to proceed *pro se.* However, although the court carefully and repeatedly explained to Burns that he had to choose between representing himself and being represented by appointed counsel, and gave Burns numerous opportunities to unequivocally assert his intention to proceed *pro se,* Burns *never* made such an assertion. Instead, he seemed to desire some sort of hybrid form of representation, whereby both he and his appointed counsel would be permitted to examine witnesses, make objections, and argue motions. While the district court would have been within its discretion in permitting this practice, Burns did not have a constitutional right under the Sixth Amendment to combine self-representation with representation by counsel. *United States v. Mosely,* 810 F.2d 93, 97 (6th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 129, 98 L.Ed.2d 87 (1987); *United States v. Weisz,* 718 F.2d at 425. It would not be terribly cynical to suppose that Burns' equivocal requests were made more with an eye to creating an issue on appeal than for any other purpose.

Because Burns has gone to great lengths in his brief and at oral argument to demonstrate that he *did* unambiguously assert his right to represent himself, we recount the saga in some detail. At a hearing before a magistrate on December 22, 1983, Burns stated that he "would like to try to represent [him]self, if at all possible." Tr. 12/22/83 at 3. The magistrate, however, after questioning Burns about his financial capacity to hire an attorney, appointed a Mr. Garber in "an advisory capacity." *Id.* The court then left it up to Burns, Garber, and Judge Hogan "to work out the precise parameters of that representation." *Id.* at 11. A docket entry filed January 10, 1984 reflects the appointment. Record ("R.") 21.

Mr. Garber appeared on behalf of Burns before the magistrate later that afternoon, and addressed the court as to the bail amount and several other preliminary matters. Tr. 12/22/83 at 19–23. Over the next two weeks, Garber again filed several motions on Burns' behalf; each stated that it was filed "by defendant, by and through counsel." *See, e.g.,* R. 23, 24, 25, 44, 53. On January 13, 1984, Judge Hogan inquired of Garber whether the question of Burns' *pro se* status had been resolved and Garber replied, "We have been having some discussions along that line." Tr. 1/13/84 at 23. Judge Hogan then specifically stated, "I only want one of you trying the case in court." *Id.* at 24. Garber said he understood, though alluding to the possibility that he would "address that maybe in another week or so." *Id.*

In February 1984, following the government's motion in opposition to the appointment of Garber as Burns' counsel, Burns filed ("by and through his appointed counsel") a pleading, signed by Garber, asserting that he was in fact indigent and requesting that his appointed counsel remain on the job. R. 46. In the pleading, Burns asserted that

Defendant has had the assistance of counsel since arraignment, and a ... vacation of counsel appointment would seriously and adversely affect the defendant's Sixth Amendment rights to effective assistance of counsel.

R. 46 at 4. Judge Hogan denied the government's motion on February 23, 1984,

ruling that "appointed counsel shall continue representing Burns." R. 48.

Two months later at a status hearing, Burns attempted to address the court directly regarding some motions on which the court had ruled. The following colloquy then occurred:

The Court: Have you talked it over with Mr. Garber?

Mr. Burns: I'm talking to the bench.

Mr. Garber: He's discussed this with me, your honor.

The Court: You aren't *pro se* quite. I think Mr. Garber is appointed to represent you and I've left him in representing you despite some concerns. And I really don't want to get involved in two people trying this case. I want to get to trial.

Mr. Burns: Yes, your honor.

The Court: All right. You understand that. All right.

Tr. 4/24/84 at 15–16.

At the first trial, Garber conducted cross-examination of government witnesses and addressed the bench on motions and objections. At one point, Burns attempted to address the bench directly, and was told by Judge Hogan that he should address the court only through his attorney. The court then said to Burns, "Mr. Garber is going to handle the trial, you understand that?" Burns responded, "Yes, sir." Tr. 5/10/84 at 104. Garber proceeded to act as Burns' attorney until the court declared a mistrial on June 13.

The issue next surfaced on September 28 at a status hearing when, following a flurry of handwritten motions from Burns, the lead prosecutor asked the court to resolve once and for all Burns' status, reminding all present of the court's repeated rulings that Burns could not enjoy dual representation. Tr. 9/28/84 at 41–42. Judge Hogan again questioned Garber about the *pro se* issue.

The Court: Mr. Garber, Mr. Burns?

Mr. Garber, you're representing Mr. Burns still, and I haven't had any indication that you're not going to continue to.

Mr. Garber: No, Your Honor, I haven't either.

*Id.* at 44–45. The court then stated again that he would not allow hybrid representation. *Id.* at 45. Burns responded that he had no quarrel with Garber's assistance, but that as he understood it, he had been granted *pro se* status at the initial hearing with the magistrate, and Garber had only been appointed to assist him; he wondered "by what magic formula [his] *pro se* status ha[d] evaporated." *Id.* at 46. Judge Hogan again explained to Burns that Garber had been appointed as his lawyer, and that Burns could attain *pro se* status only by trying the case himself:

[M]y understanding was throughout the trial Mr. Garber was your lawyer. He tried the case. And as you said, he did an exceptional job throughout the part of the trial we did have. And it was not that he was sitting there at counsel table just helping you to ask questions, or telling you how to properly phrase the question, or telling you how to properly file a motion. That's the status of the standby-type counsel that I believe Magistrate Dwyer was addressing to you.

And I think that he is your lawyer, and that he's appointed to be your lawyer, and he has been working and had worked very hard as your lawyer, and continues to. And that's the way to leave it, unless he doesn't actively involve himself in the case. At that point, you become *pro se*, and then you're going to try the case.

Tr. 9/28/84 at 47. Although Burns protested that he did not want his (erroneously assumed) *pro se* status to "completely disappear," he stated that if he was not allowed to file the motions himself, "I may just have to go *pro se* myself." *Id.* at 48. The court reiterated that Burns should file motions only through his counsel, *id.* at 50, and agreed not to take action on the pending *pro se* motions until they were refiled by Garber, *id.* at 52. Despite this extended explanation of the choice facing him, Burns did not make a motion to proceed *pro se*.

The second trial began in January 1985, with Garber acting as counsel without objection from Burns. One month into the trial, the issue of Burns' *pro se* status arose for the final time. Burns addressed the court in order to state that he objected

to "not being allowed to proceed *pro se*." Tr. 2962. In response, the court stated that, "You did not have a *pro se* status.... There has not been a motion to discharge [Garber] made by you and to go *pro se* yourself or to try your case. I told you one of the two of you was going to try, if you wanted to try it or Mr. Garber, but not both." *Id.* The court then once again put Burns to the choice: "If you want Mr. Garber to be discharged and you want to take over, and that is your application, I can hear an application on that." *Id.* at 2963. Burns did not make a motion to dismiss Garber, or to try the case himself.

The tortuous history recounted above demonstrates that Burns was told several times that the court would not allow both Burns and Garber to conduct the defense, and had numerous opportunities to tell the court that he wanted to represent himself on the condition offered. Not once, however, did he do so; Burns apparently was unwilling to proceed *pro se* if that meant he would have to forego the considerable benefits of Garber's representation. The trial court refused to let Burns have his cake and eat it. This is not a violation of the Sixth Amendment.

### X. THE ERROR IN SENTENCING BELL

FED.R.CRIM.P. 32(c)(3)(A) allows a defendant on sentencing to challenge the factual accuracy of items in the presentence report. If he does so, the trial court is to make findings on the disputed point or a determination that no such finding is necessary because the matter controverted will not be taken into account on sentencing. FED.R.CRIM.P. 32(c)(3)(D). The judge's findings or determination are to accompany any copy of the presentence report sent to the Bureau of Prisons or Parole Commission. *Id.*

The Rule was triggered by factual clarifications as to Bell's past drug use and past drug distribution activities. But the forwarding requirement was not met, evidently through inadvertence. The government agrees that remand is appropriate. Brief for the Government at 108. As to

Bell we remand the case to the trial court for full compliance with Rule 32(c)(3)(D).

### XI. CONCLUSION

The convictions of defendants Bell, Black, Burns, and Tarantino are affirmed on all counts. Bell's case is remanded to the district court for further proceedings consistent with this opinion.

*So ordered.*